Cohen **HAWKINS** and Robert D. Hawkins, a minor by Cohen Hawkins, father and next friend, Plaintiff,

v.

Dr. Charles A. **OZBORN**, Defendant.

No. WC 73–37–K.

United States District Court,
N. D. Mississippi, W. D.

Sept. 6, 1974.

William R. Bradley, Clarksdale, Miss., John C. Moore, Memphis, Tenn., for plaintiff.

Louis G. Baine, Jr., Jackson, Miss., W. B Meek, Eupora, Miss., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KEADY, Chief Judge.

In this diversity action, Cohen Hawkins, plaintiff, both as parent and on behalf of his minor son, Robert D. Hawkins (Robert), a Tennessee citizen, sues Dr. Charles A. Ozborn, defendant, a Mississippi citizen, for substantial damages ($15,000 for the parent's action and $110,000 for Robert's claim), on account of alleged medical malpractice arising from defendant's treatment of Robert. By his answer, defendant denied charges of negligence, lack of adequate medical knowledge, and failure to exercise requisite skill in his care of Robert as a patient. The issues were submitted to the court in a nonjury trial; after a two-day evidentiary hearing, the court now makes its findings of fact and conclusions of law as required by Rule 52, F.R.Civ.P.

### FINDINGS OF FACT

1. Robert D. Hawkins, then 10 years of age, resided in August 1971 with his parents in Webster County, Mississippi. The Hawkins family in 1972, after the occurrence of the incident giving rise to this litigation, moved to Memphis, Tennessee, where Cohen Hawkins has permanent employment and he and his family, including Robert, still reside.

2. Dr. Ozborn, the defendant, is a physician duly licensed under the laws of the State of Mississippi, who resides at Eupora, in Webster County, and practices general and family medicine, exclusive of surgery. A 1964 graduate of the University of Mississippi School of Medicine, the defendant, after interning at the Mississippi Baptist Hospital, entered the medical practice in 1965 at Eupora, where he has been since located except for two years in government health service.

3. On Sunday, August 22, 1971, during the late afternoon, Robert became ill with a stomachache, later vomiting. During the night the boy developed fever and diarrhea; he suffered cramping, stomach pains intermittently and slept fitfully. Robert was given aspirin by his mother. The next morning, Mrs. Hawkins took Robert to the office of the defendant, who first saw the patient at 9 a. m. and was advised of his

complaints. Robert's blood pressure and temperature (101°) were checked. The defendant noted the presence of dark green loose stool, hyperactive bowel sounds, generalized abdominal tenderness, but detected no rebound pain. The abdomen, although mildly protruding, was soft and not rigid. Defendant's impression was that the symptoms indicated an acute infectious, or bacterial, gastroenteritis, an illness which had recently been manifest in a number of children cases attended locally by defendant. The physician prescribed Terramycin, an antibiotic, to combat the suspected infection and Phenergen suppositories to alleviate nausea. Ozborn discussed with Mrs. Hawkins the possibility of hospitalizing Robert, but when she advised that the Hawkins family was without hospital insurance coverage, defendant allowed Robert to return home for medication there, but with instructions to return the following day if his condition failed to improve.

4. During Monday night, Robert's symptoms were not relieved but somewhat worsened, as he experienced continued nausea, vomiting, diarrhea, cramping and generalized abdominal pain , and increased fever. His temperature went to 101°. During the early morning hours of Tuesday, August 25, Cohen Hawkins contacted defendant by telephone and advised him of Robert's condition. Defendant arranged for the boy's admission at the Webster County General Hospital at Eupora, and Robert was so admitted. The patient, upon admission at 5:15 a. m. that day, had nausea and diarrhea, and was vomiting. His temperature was 101°, and pulse 100. By 5:30 a. m. he was receiving Plasmylite drip with vitamins, and an injection of Phenergen. A complete blood count (CBC) and urinalysis were ordered by defendant, who instructed the nurse in charge to notify him within 1 or 2 hours if the patient was not relieved. Nurses' record noted at 6:30 a. m. no vomiting since admission; the defendant was not called.

5. On the morning rounds, at 8 a. m. the defendant saw Robert in his hospital room. He observed the record showing 100.6° temperature, continued nausea, vomiting of small amount, and loose stool. On physical examination, defendant noted essentially the same findings as were present 24 hours earlier at his office, i. e., mild, generalized tenderness, hyperactive bowel sounds (as opposed to a "silent abdomen"), and slight dehydration from nausea. Ozborn also noted a mild protuberance of stomach which remained soft, but there was no abdominal distention or rigidity. The physician continued in his working diagnosis of acute infectious gastroenteritis, although he considered other possibilities, including appendicitis. Yet he found the patient to be without rebound pain or localized abdominal tenderness in the lower right quadrant or elsewhere. The doctor then ordered Polycillin, a broader antibiotic, for the suspected intestinal infection and Dramamine for nausea. The blood count taken that morning showed white blood count (WBC) of 18,592, which is a highly elevated count and usually associated with infectious diseases rather than appendicitis. Appendicitis generally manifested a lower WBC ranging from 12,000 to 14,000. The defendant, however, did not order X-rays. The defendant adhered to his previous diagnosis of acute infectious gastroenteritis and continued Robert on the same medication throughout the remainder of Tuesday, August 26. Robert's temperature and pulse improved, remaining about normal. Bowel sounds remained hyperactive, and generalized abdominal tenderness was noted. At second reading, WBC was reduced to 16,812. At Wednesday rounds, both morning and evening, defendant detected no localized pain, or rebound pain. Although slightly protruded, the abdomen continued soft and nonrigid, without distention. By Wednesday evening, the patient, in the defendant's opinion, had shown considerable improvement, and was believed to have obtained symptomatic relief from

medication from his complaints, including dehydration, existing at time of admission to the hospital.

6. During the night hours of August 26–27, Robert's condition materially worsened. By 1 a. m. on Thursday, according to the nurse's record, he vomitted a large amount of bile and complained of abdominal pain. The hospital record noted for the first time that the "abdomen appears distended". At that time Tylenol, an aspirin-like medicine, which had been previously ordered by defendant, was refused by Robert, yet he slept at intervals throughout the night. On Thursday morning rounds at 8 a. m., the defendant found Robert's condition to be greatly changed from the previous evening, for the patient now had a distended, rigid abdomen; there was now present severe generalized abdominal tenderness, without bowel sounds. Defendant felt Robert had an "acute abdomen", and he requested immediate surgical consultation with Dr. Booth, a local general surgeon. Ozborn was unable to directly reach Dr. Booth, then in surgery on another case, and sent his request by a nurse. Until that time, the defendant had made no entries in the hospital record, nor had he ordered X-rays for his patient.

7. Dr. Booth first saw Robert at about 10 a. m. and noted he was obviously, very acutely ill, with his abdomen very distended and tender, without audible bowel sounds. X-rays, which were at once ordered by Dr. Booth, showed marked distention of the small bowel with air fluid levels. Dr. Booth was of the opinion that the patient probably had a perforated appendix with an abscess formation and small bowel obstruction, along with probable severe peritonitis. Even though Robert was thought to be in critical state and regarded as a poor surgical risk, Dr. Booth decided that an immediate exploratory operation was necessary. Under general anesthesia, surgery began at 11 a. m. with a McBurney incision. A large amount of pus exudate, less than a quart, was drained from the abdomen; and the appendix, which was ruptured, was removed. The patient was treated with large doses of Keflin. Even so, the patient's fever remained at 103°, and he was disoriented and continued critically ill. When the patient's abdomen failed to decompress naturally, Dr. Booth, on August 29, performed a second operation in which he decompressed the small bowel. Robert's condition began to improve, and did steadily get better until September 1. The patient then began to have profuse bleeding from the stomach and esophagus. Bleeding from the esophagus was the result of ulcerations caused by a Levine tube which had been inserted, post operatively, to aid in keeping the abdomen decompressed. These resulting complications produced a stormy course for the patient who underwent several blood transfusions and had great difficulty in swallowing. After his first hospital discharge on September 9, fever-free, Robert nevertheless returned the same day, with fever and vomiting. His complaints of gagging and choking were directly attributable to strictures in the esophagus. He was discharged home on September 24 for later treatment by dilation of the esophagus stricture. Robert's inability to swallow meats and solid foods continued for a period of many months. He was last "hung up" from attempting to eat food in December 1973, when Dr. Booth employed a dilation procedure. The patient missed eight weeks of school, has experienced much pain and discomfort, and has had to have his food run through a blender. The resultant condition, described by Dr. Booth as a stenosis, or scouring of the inner lining of the esophagus, a condition which restricts one's capacity to swallow, is likely to remain with Robert for an indeterminate period of time.

8. Dr. Booth testified that he felt it was advisable for general practitioners to promptly refer for surgical

consultation all children cases where abdominal tenderness is observed, and that he, as the only surgeon in Webster County, had tried to establish such procedure with the three general practitioners in the county. Dr. Booth's view was that while general practitioners, on the basis of their medical learning, should be competent to diagnose appendicitis, yet he feared that giving some medicines, like pain-killing shots or tablets, might obscure or mask symptoms peculiar to appendicitis and thus render accurate diagnosis more difficult. Dr. Booth's opinions, however, were not shared by any of the medical experts testifying on behalf of defendant. These witnesses included not merely the defendant himself, who graduated in the top 15% of his medical class, and Dr. W. B. Gifford, another Eupora general practitioner, but also two surgeons, Dr. Charles G. Barnes of Gamble Brothers & Archer Clinic at Greenville and Dr. W. A. Neely, Professor of Surgery at the University Medical School at Jackson. The court finds as fact that it is within the medical competence of general medical practitioners and pediatricians to timely and correctly diagnose abdominal ailments, including appendicitis, and that it is not a standard prevailing in the medical practice, either in Webster County or elsewhere, for young patients complaining of abdominal pain or tenderness, without more, to be automatically referred to a surgeon for consultation. The overwhelming evidence establishes that, despite Dr. Booth's contrary opinion, automatic referral of all such cases would be not only unrelated to a patient's adequate medical care but highly impracticable and impose intolerable burdens upon surgeons. The defendant, qualified and learned in medicine as a general practitioner, had medical knowledge, training and skill sufficient to make a correct diagnosis of abdominal ailments, including appendicitis, without summary referral of the case to a surgeon.

9. Again, Dr. Booth expressed the opinion that if the case had been earlier referred to him, the most likely diagnosis, considering Robert's age, would have been appendicitis. This view was based upon clinical findings which showed a WBC of 18,000, generalized abdominal tenderness, abdominal cramping, along with fever, nausea and vomiting. Dr. Booth expressed the belief that it was difficult to determine rebound pain and he did not regard the presence of hyperactive bowel or absence of abdominal rigidity or distention as symptoms not suggesting appendicitis. Dr. Booth conceded that if a patient was in fact suffering from acute infectious or bacterial gastroenteritis, the course followed by defendant would be acceptable medicine, and prescribing antibiotic and anti-nausea remedies would be correct. Dr. Booth also conceded that symptoms of gastroenteritis would be the very conditions noted by defendant and which appeared in the hospital charts through the night of Wednesday, August 26. All other medical testimony directly contradicted Dr. Booth's stated opinions. Dr. Barnes and Dr. Neely, both of whom are highly qualified surgical specialists, affirmed that the diagnosis of acute infectious gastroenteritis reached by the defendant was the correct working diagnosis, and that consequently the defendant's prescribed course of treatment was reasonable and proper. Dr. Barnes' opinion was that the initial diagnosis of infectious gastroenteritis was indeed the correct one, that the patient probably had infectious gastroenteritis from the time of the patient's first examination at defendant's office on Monday until late Wednesday night, and that it was at that point in time when the patient likely developed acute appendicitis secondary to the original infection. Dr. Neely stated that the symptoms exhibited by the patient in the hospital through Wednesday night were entirely compatible with acute infectious gastroenteritis and that defendant's diagnosis was reasonable and probably correct. Both Nee-

**1394**

ly and Barnes testified that Robert's case was a rare, unusual and atypical case of appendicitis. Their testimony was also to the effect that death might likely ensue where a patient had a gangrenous, ruptured appendix for more than 24 hours, but the gangrenous condition may develop within a minimum of 8 hours, and abdominal distention and peritonitis quickly develop in the peritoneum following a rupture of the appendix. Both specialists noted that gangrene was found at the time of Booth's surgery at 11 o'clock, a. m., on Thursday, or approximately 10 hours after abdominal distention was first noted by the hospital nurse at 1 o'clock, a. m., that day.

10. Dr. Gifford's testimony was essentially the same as that of the two surgical specialists and he expressed the view that the most probable diagnosis up to and through Wednesday night was gastroenteritis. He felt that since the medications for that ailment were proper and relief for the patient was being obtained, the defendant was applying reasonable medical skill and did not fail to take all reasonable steps or measures to afford proper care to the patient.

11. Regarding the matter of X-rays, Dr. Booth voiced the belief that if X-rays had been taken earlier than those ordered by him on Thursday morning, they might probably have aided in diagnosing the appendicitis. X-rays which were made immediately before the initial surgery did show distention of the small bowel, compatible with possible early mechanical obstruction. The other medical witnesses disagreed sharply with Dr. Booth's testimony concerning X-rays. Dr. Barnes testified flatly that X-rays were not helpful in the diagnosis of acute appendicitis. Dr. Neely corroborated Dr. Barnes in this regard, affirming that X-rays, which he regarded usually of no diagnostic aid in appendicitis cases, may occasionally present a clue of undifferentiated intestinal obstruction. Dr. Gifford held a similar position on the worth of X-rays. The court finds as a fact that X-rays taken earlier than those ordered by Dr. Booth would have been of doubtful value and of no aid in assisting the physician in making a diagnosis of appendicitis prior to the late hours of Wednesday night.

12. The court finds as a fact, from conflicting medical evidence, that the symptoms exhibited by Robert from Monday morning through Wednesday night presented a typical or conventional case of acute infectious, or bacterial, gastroenteritis, and they did not suggest the likelihood or probability of appendicitis; that the defendant, having arrived at a working diagnosis of acute gastroenteritis, proceeded to prescribe benign medicine to alleviate that ailment; that he afforded the patient adequate medical care. The court further finds as a fact that the reasonable medical probability is that the patient's initial ailment was, in fact, acute infectious gastroenteritis and that not until the night hours of August 26–27 did he develop, as secondary to the gastroenteritis infection, an acute appendix which ruptured and became gangrenous within a period of not exceeding 10 hours prior to Dr. Booth's initial surgery. The court further finds as a fact that the medication prescribed by defendant, while correctly given for gastroenteritis, did not mask, or make obscure, the symtoms of appendicitis which were duly noted at or near the onset of the appendicitis. The court further finds as a fact that as soon as the symptoms usually associated with appendicitis became apparent, the patient was referred to a competent surgeon for consultation; and this consultation resulted in removal of the ruptured appendix and in treating the patient for the effects of acute appendicitis.

CONCLUSIONS OF LAW

1. This court has jurisdiction to hear this cause by reason of the diversity of citizenship of the parties and the requisite amount in controversy.

2. As acknowledged by all parties, the substantive law of Mississippi is here controlling.

3. The burden of proof in a malpractice case is, of course, the same as obtains in negligence cases generally. Thus, in a suit for injuries caused by alleged malpractice, the burden is upon the plaintiff to prove by a preponderance of the evidence the want of reasonable and ordinary care and skill of the physician. DeLaughter v. Womack, 250 Miss. 190, 164 So.2d 762 (1964). Malpractice liability may result either through lack of skill or negligence to apply it, if possessed. Newport v. Hyde, 244 Miss. 870, 147 So.2d 113 (1962). In this case plaintiff asserts both causes of action on behalf of the parent and the minor patient himself. In *DeLaughter*, the Supreme Court of Mississippi adhered to the rule here applicable, saying:

"[A] physician must possess that reasonable degree of learning, skill, and experience which ordinarily is possessed by others of his profession, and that he must exercise reasonable and ordinary care and diligence in the exertion of his skill and the application of his knowledge, and exert his best judgment as to the treatment of the case intrusted to him—in short, a physician is bound to bestow such reasonable and ordinary care, skill, and diligence as physicians and surgeons in good standing in the same neighborhood, in the same general line of practice, ordinarily have and exercise in like cases." 164 So.2d at 766.

4. It is settled law in Mississippi that negligence on the part of a physician is not to be presumed solely because of untoward results, Ross v. Hodges, 234 So.2d 905 (Miss.1970), nor can negligence be established in a malpractice case in the absence of expert medical testimony that the defendant failed in some particular respect to use ordinary care and skill, unless the matter in issue is within the common knowledge of the layman. Dazet v. Bass, 254 So. 2d 183 (Miss.1971). In this case we are concerned, of course, with an illness about which laymen have no common knowledge, so that proof of negligence

—either want of skill or failure to exercise such skill—can only be made out by credible expert medical testimony. Plaintiff, of course, offered no evidence as to the lack of adequate medical training and knowledge on the part of defendant so that that aspect of liability is not an issue in the case. Indeed the undisputed proof is that Ozborn was properly trained, qualified and competent in every respect as a general practitioner to make a diagnosis of appendicitis. The other aspect is whether defendant failed to exercise reasonable care in the practice of his skill and learning in handling Robert's case. On that point we acknowledge that Dr. Booth's testimony raised an issue of fact which is rebutted by the testimony of defendant and three other medical witnesses. We have previously alluded to the conflicting medical opinions, which this court has resolved in favor of the defendant. We are persuaded that the substantial evidence in the case overcomes Dr. Booth's opinions and that his testimony must be evaluated largely in terms of hindsight rather than the conditions which actually confronted the physician and patient at the critical period of time under review. Dr. Booth had no knowledge whatever of the case prior to 10 o'clock, a. m., on Thursday, and in the course of his testimony admitted his unfamiliarity with the hospital charts and clinical findings—data which must be carefully evaluated and considered in order to reach impartial conclusions. Thus, we perceive that there was no proof which persuades us that the defendant's original diagnosis was unreasonable or, for that matter, erroneous. On the contrary, the weight of the evidence supports the conclusion that Ozborn's diagnosis was reasonable and compatible with all symptoms exhibited, and was probably correct. That his patient suffered a ruptured appendix with unfortunate dire consequences can be no basis for implying either want of knowledge, or failure to exercise due care, on the part of the defendant-physician. The whole evidence establishes that appendicitis is often difficult to

diagnose and that notwithstanding the exercise of utmost care on the part of skillful and qualified physicians, a patient may have a ruptured appendix. Certainly no court has ever held that a physician is a warrantor of cures. Here, where the defendant has effectively discharged all legal responsibilities owed by him to his young patient, it would be unreasonable to adjudge him liable for an unfortunate result. As other courts have frequently pointed out, if the failure to cure is to be taken as evidence of negligence on the part of a physician or surgeon in causing bad results, few would be bold enough to engage in the practice of medicine at the risk of having to pay damages to any patient who had less than a complete recovery.

5. As the trier of fact, the court concludes that the plaintiff has failed to establish negligence on the part of the defendant which proximately caused the losses and damages sued for, and no recovery shall be allowed.

Let an order be issued accordingly.