564 So.2d 1346 (1990)
Paul C. PALMER and Marilyn J. Palmer, Individually and in Their Official Capacity as Heirs and Representatives of the Surviving Heirs of Patricia Leanne Palmer
v.
BILOXI REGIONAL MEDICAL CENTER, INC., d/b/a Howard Memorial Hospital and its Successors and Assigns, and Frank Martin, M.D., and James W. Wooten, M.D., and John and Jane Does 105 (a Fictitious Name).
No. 07-CA-58671.
Supreme Court of Mississippi.
April 25, 1990.
Rehearing Denied August 8, 1990.
*1349 Charles R. McRae, Margaret P. Ellis, McRae & Ellis, Pascagoula, for appellants.
Frederick J. Mannino, Page Mannino & Peresich, Biloxi, Robert C. Galloway, Galloway & Galloway, Gulfport, for appellees.
Before DAN M. LEE, P.J., and PRATHER and ROBERTSON, JJ.
PRATHER, Justice, for the Court:

I. INTRODUCTION[1]
On March 30, 1983, Paul and Marilyn Palmer [hereinafter Palmer] filed a complaint in the Harrison County Circuit Court alleging that the negligence of Biloxi Regional Medical Center [hereinafter BRMC], Frank Martin, M.D., and James Wooten, D.D.S.,[2] was the proximate cause of the death of their daughter, Patricia Palmer [hereinafter Patricia]. Martin was voluntarily dismissed by Palmer.[3] Palmer sought $1.8 million in compensatory damages, $500,000 in punitive damages, costs, and interest.
On February 13, 1986, Wooten moved for dismissal of the suit under Rule 56 of the Mississippi Rules of Civil Procedure [hereinafter Rule or Rules]; BRMC moved for dismissal under Rule 12(b)(6) and Rule 37 on October 18, 1983, and June 24, 1986, respectively. After hearings on all the motions, Circuit Court Judge James E. Thomas dismissed the suit against Wooten and BRMC. Palmer subsequently appealed the dismissal to this Court.

II. FACTUAL BACKGROUND[4]

A. Pre-Complaint
On April 4, 1981, seventeen-year-old Patricia Palmer was seriously injured in an automobile accident; she was subsequently admitted to the intensive care unit of Biloxi Regional Medical Center[5] and placed under the primary care of neurosurgeon, Dr. Richard Buckley. Consultants employed by Buckley included Martin, who is a general surgeon, and Wooten, who is an oral surgeon. Wooten was employed solely and specifically to treat a fractured mandible (lower jaw).
On April 6, 1981  after Patricia's neurological condition stabilized  Buckley advised Wooten that the time was ripe to place Patricia under general anesthesia and perform the "nonelective" surgery to repair *1350 her fractured jaw. Postponement beyond April 8, according to Buckley, would not be "in Patricia's best interest." Wooten performed the surgery without complication on April 7 and 8, 1981. Patricia died of cardiopulmonary arrest[6] on April 11. Buckley noted on the "discharge summary" that the cause of the arrest was "[u]ndetermined, pending results of autopsy."
An autopsy was performed by Dr. Eldon McClain, a pathologist at BRMC. McClain summarized the autopsy diagnoses:
[Patricia] was admitted shortly following an automobile accident at which time she was noted to have bruises, abrasions and cranial fracture. She had initially shown loss of consciousness but neurologic function appeared to be intact. She underwent operative repair of the mandibular fracture on the fourth hospital day. On the seventh hospital day there was an unexpected cardiac arrest. Resuscitative attempts resulted in reestablishment of cardiac function. However, neurologic function was that of a total coma. The patient was maintained on a respirator for about sixteen hours following arrest during which time no neurologic function was discernible. After this time, support measures were discontinued and the patient was pronounced dead.
The autopsy demonstrated the multiple injuries suffered in the automobile accident. These included the bilateral basilar skull fracture, abrasions and bruises of the left arm, thigh and head. There were multiple internal contusion injuries. These included multiple small areas of submeningeal injury with congestion and hemorrhage in the right frontal lobe, subpleural contusion injuries of the left lung base and small areas of injury beneath the capsules of the spleen and left lobe of the liver. No clear cause of the cardiac arrest was determined. Cerebral swelling and edema occurred primarily due to the anoxic damage suffered during the arrest, but was perhaps in part related to the original injury. Left pleural effusion with some blood staining was in part due to the original injury but this along with pulmonary congestion and edema were also terminal changes. The remaining findings at autopsy are considered incidental and are listed [elsewhere in the report]. (emphasis added).
Notably, the death certificate  signed by an individual other than McClain  states that Patricia died of cardiopulmonary arrest due to a stress ulcer.[7] The detailed autopsy report, however, concluded that "[n]o actual ulcerations [were] found" in the gastrointestinal tract.

B. The Complaint
On March 30, 1983, Palmer filed a negligence action against BRMC, Martin, and Wooten. With regard to Martin and Wooten, Palmer alleged:
... that [they] were in charge of treating [Patricia] and making [the] diagnosis as to her illness and injuries[;]
... that in their examination, treatment, supervision of treatment and surgery of the decedent for her ... physical condition, negligently failed to exercise ordinary care and failed to exercise the degree of care and skill exercised by the physician and surgeon in like cases by failing to diagnose and treat the stress ulcer [alleged by Palmer to have caused Patricia's cardiopulmonary arrest], let the stress ulcer go unattended and further by failing to exercise that care due surgeons in like cases for her... injuries[;]
... that [they] hold themselves out to warrant successfull [sic] treatment and to warrant their skills as to be skills which would successfully treat [Patricia;]
... that [they] failed to disclose information necessary to have [Patricia and her] parents ... be informed so that mature *1351 judgments could be made in the alternative[;]
... that [they] failed to inform [Patricia and her parents] of their inability to perform the certain diagnosis and treatments of [Patricia] and failed to call in the necessary personnel to treat [Patricia].
With regard to BRMC, Palmer alleged:
... [BRMC] holds itself out ... as a hospital skilled in caring for people who need medical care and attention[;]
... that its staff, agents, servants, and employees negligently failed to exercise ordinary care and failed to exercise that degree of care and skill commonly exercised by institutions of like kind[;]
... that they [BRMC's staff, agents, servants, and employees] allowed [Patricia] to become in an irreversable [sic] situation by failing to properly supervise her treatment, getting the ... necessary care and skilled personnel to treat [Patricia] thereby causing [her] to expire and terminate on or about April 11, 1981.
Palmer sought $1.8 million in compensatory damages, $500,000 in punitive damages, costs, and interest. As stated, Martin was dismissed voluntarily by Palmer.

C. Discovery
The same day on which the complaint was filed, Palmer propounded interrogatories to, and requested production of documents from, Wooten and BRMC. Exchanges between Palmer and the two defendants  e.g., motions, responses, and other matters pertaining to discovery  will be discussed separately.

1. Palmer v. Wooten
Wooten answered Palmer's complaint on April 27, 1983. Basically, Wooten contends that his sole responsibility was to "render certain treatment to a fracture of the mandible or jawbone and that he was at no time responsible for or undertook overall care or treatment or examination of Patricia." On May 13, Wooten timely filed answers to Palmer's interrogatories and request for production of documents.
Wooten subsequently propounded interrogatories to, and requested documents from, Palmer on May 18. Palmer, however, failed to respond. On July 25, Wooten filed a motion to compel. Nearly two months later, on September 19, Palmer filed her answers to Wooten's interrogatories and request for documents; these answers were incomplete. On September 30, then-presiding Circuit Court Judge Vlahos ordered Palmer to supplement "proper" answers to Wooten's interrogatories; these answers were filed on October 7, 1983. Palmer's supplemental answers were as incomplete as her original answers. Consider the following examples.
Interrogatory No. 3:
List every fact, opinion, document and other piece of evidence which plaintiff claims supports the allegation in paragraph III of the complaint that while at defendant hospital the deceased Patricia Leanne Palmer "sustained a stress ulcer."
Palmer's Original Answer to No. 3:
See the hospital records, the death certificate and the autopsy report.
Court Order to Supplement Answer to No. 3:
With reference to Interrogatory No. 3 and the answer thereto, the plaintiff shall specify what documents within "the hospital records" plaintiff and [her] attorneys rely on in alleging that the deceased sustained a stress ulcer.
Palmer's Supplemental Answer to No. 3:
Please see response to Interrogatory No. 4 of the original answers to Interrogatories.
Palmer's Original Answer to No. 4:
See death certificate and autopsy report.
Interrogatory No. 5:
List every fact, opinion, document and other piece of evidence which plaintiff claims supports the allegations in paragraph III of the complaint that the defendant Wooten was "in charge of treating the said patient and making said diagnosis as to her illness and injuries."
Palmer's Original Answer to No. 5:

*1352 Please see medical records which indicate that he was a member of the treating staff rendering diagnosis, surgery and other treatment to the deceased.
Court Order to Supplement Answer to No. 5:
With respect to Interrogatory No. 5 and the answer thereto, plaintiff shall specify what specific diagnosis and treatment [she] and [her] attorneys contend Dr. Wooten had primary responsibility for as opposed to any other defendant or other physician, and shall specify what particular documents within the medical records plaintiff and [her] attorneys contend supports [sic] such allegations.
Palmer's Supplemental Answer to No. 5:
Plaintiff will supplement this Interrogatory after the taking of the Defendant's deposition.[8]
Interrogatory No. 14:
List every fact, opinion, document and other piece of evidence which plaintiff contends supports the allegation that defendant Wooten should have called in each of the persons or categories of persons listed in answer to the preceding interrogatory.
Palmer's Original Answer to No. 14:
Please see the medical records.
Court Order to Supplement Answer to No. 14:
With respect to Interrogatory No. 14 and the answer thereto, plaintiff shall specify what documents within "the medical records" [she] and [her] attorneys rely upon with respect to Interrogatory No. 14.
Palmer's Supplemental Answer to No. 14:
Plaintiff will supplement [her] answers to this question after the taking of the deposition of the Defendant.
Interrogatory No. 19:
For each person you expect to call as an expert witness at the tiral [sic] of this cause, give: (a) The expert's name and current address; (b) The subject matter upon which the expert is expected to testify; (c) The substance of the facts and opinions to which the expert is expected to testify; and (d) A summary of the grounds for each opinion.
Palmer's Original Answer to No. 19:
The plaintiff [does] not have an expert at this time.
Court Order to Supplement Answer to No. 19:
No order given.
Palmer's Supplemental Answer to No. 19:
No supplemental answer provided until August 22, 1986  approximately three years and three months after Wooten propounded the interrogatory to Palmer.
Approximately two years and four months later  on February 13, 1986  Wooten filed a motion for summary judgment. The hearing on the motion commenced on June 13.
Notably, no action by Palmer transpired between October 7, 1983, and June 10, 1986  albeit Palmer notified all defendants on October 5, 1983, of her intention to depose them. During this "quiet" period, unsuccessful attempts to motivate Palmer to act were made by at least one of the defendants. On June 10, 1986  only three days prior to the summary judgment hearing  Palmer finally responded; she filed affidavits in opposition to Wooten's motion. These affidavits revealed to Wooten for the first time Palmer's proffered experts  Dr. Timothy Lamphier and Marilyn Palmer (Patricia's mother). "[N]o additional supplementation to discovery [had to date been] filed" by Palmer and, "in particular, no response [had been] made to ... Wooten's expert interrogatory" (quote from trial judge's written opinion).
During the hearing, presiding Judge Thomas struck the affidavits sua sponte because they comprised mere "conclusory, *1353 nonfactual opinions." He subsequently recessed the hearing until July 9 in order to "review the voluminous case file" and to provide Wooten an opportunity to belatedly depose Lamphier. Palmer was also informed by the judge that additional factually-supported affidavits could be filed.
Depositions of Lamphier as well as Wooten and Wooten's proffered expert, John N. Kent, M.D., were taken and filed at the circuit court. At the judge's request, the July 9 hearing date was rescheduled to August 29, 1986. On August 22, 1986, Palmer filed supplemental answers to Wooten's interrogatories. At Palmer's request, the August 29 hearing date was rescheduled; on October 6, the hearing continued and concluded. And on October 23, 1986, Wooten's motion for summary judgment was granted:
After considering the pleadings, discovery, affidavits, testimony and argument of counsel; and resolving all factual issues in the light most favorable to the plaintiff, it is the conclusion of this Court that summary judgment must be granted to Dr. Wooten on three bases: a) Failure of plaintiff to properly respond to discovery and court order; b) Disqualification of plaintiff's expert; c) failure of plaintiff to present a triable issue of fact.
The judge elaborated in a written analysis and iterated "that each of the bases for granting summary judgment are independent" of one another.

2. Palmer v. BRMC
On May 4, 1983, BRMC filed its answer to Palmer's complaint denying the allegations and declaring affirmative defenses. On May 12, 1983, BRMC propounded interrogatories to Palmer. On June 29, 1983, after receiving an extension of time, BRMC answered Palmer's interrogatories and request for production of documents. On July 28, 1983, BRMC filed a motion to compel Palmer to answer its interrogatories. Palmer responded on September 13, 1983  the date on which a hearing was scheduled for consideration of BRMC's motion. On October 6, then-presiding Judge Vlahos ordered Palmer to be more specific and provide supplemental answers to BRMC's interrogatories "on or before November 1."[9] Palmer provided the supplemental answers prior to the deadline.
On October 19, 1983, BRMC filed a motion to dismiss under Rule 12(b)(6) for failure to state a claim; however, this motion was not addressed by the trial judge until years later. The record indicates that the trial judge may have treated the Rule 12(b)(6) motion as one for summary judgment. Whether this was actually done is not clear. Vol. IV, at 571 and 732.
Notably, neither party initiated further discovery or other action during the next three years until June 24, 1986, when BRMC filed another motion to dismiss  this time under Rule 37. Rule 37 provides a trial judge with "considerable latitude" to impose sanctions for "failure to make or cooperate in discovery." BRMC's basis for dismissal was Palmer's "failure to seasonably supplement [his] answer to Interrogatory No. 3"  which comprised the following request:
Interrogatory No. 3:
Identify fully, giving the names, address, and telephone number of each and every person who you expect to call as an expert witness at the trial of this cause, and state the following about such expert:
(a) The subject matter, in specific detail, on which the expert is expected to testify;
(b) The substance of the facts and opinions to which the expert is expected to testify; and
(c) A summary of the grounds for each opinion to which the expert is expected to testify.
Palmer's Original Answer to No. 3:
My attorneys have not decided which expert they will call.
Palmer finally answered the interrogatory on July 3, 1986, and proffered Lamphier and Marilyn Palmer as experts adverse *1354 to BRMC's interest.[10] Notably, this information was not provided BRMC until two days after Wooten deposed Lamphier in Massachusetts (cautious attorneys for BRMC nonetheless made an "appearance" at the deposition).
On October 3, 1986, BRMC filed a supplemental answer to Palmer's expert interrogatory (which Palmer had filed on March 30, 1983). BRMC named its former co-defendant, Dr. Frank Martin, as its expert.
On October 5, 1983, Palmer filed a "notice of taking deposition" of BRMC's nursing supervisor, and a "notice of making inspection" of BRMC's ICU. On the same day, BRMC filed an answer (i.e., an objection) to Palmer's inspection request. The inspection never transpired.
BRMC's motions for dismissal were originally scheduled to be considered along with Wooten's motion when the June 13 (1986) hearing continued. But as noted in the previous subsection, the hearing was rescheduled twice and was not continued and concluded until October 6, 1986.
Based upon the evidence adduced at the hearings, the judge on October 23, 1986, "grant[ed] the relief sought by BRMC and dismissed [Palmer's] Complaint with prejudice." As was done upon granting Wooten's motion, the judge substantiated his decision to grant BRMC's motion via separate, written analysis.

III. THE ISSUES
Palmer presented thirteen issues  the most significant of which are paraphrased:
(1) whether the court erroneously dismissed the plaintiff's suit under Mississippi Rules of Civil Procedure 37 and 56; and
(2) whether the court erroneously determined that the plaintiff's experts were unqualified to testify in opposition to motion for summary judgment;
In the following analysis, some issues will be consolidated to avoid undue repetition; others will be resolved without specific reference to them; and most will be paraphrased for brevity's sake.

IV. ANALYSIS

A. Whether or Not the Trial Judge Erred in Granting Wooten's Motion for Summary Judgment
This section addresses the issue by analyzing the law applicable: (1) in medical malpractice cases, and (2) to summary judgment procedure. These laws are then applied to the facts presented in the record  viewed most favorably to Palmer.

1. Medical Malpractice: The Law[11]
Recovery in a negligence action requires proof by a preponderance of the evidence of the conventional tort elements: duty, breach of duty, proximate causation, and injury (i.e., damages). Phillips v. Hull, 516 So.2d 488, 491-92 (Miss. 1987); see also Latham v. Hayes, 495 So.2d 453 (Miss. 1986); Hammond v. Grissom, 470 So.2d 1049 (Miss. 1985). Mississippi physicians are bound by nationally-recognized standards of care; they have a duty to employ "reasonable and ordinary care" in their treatment of patients. Hull, 516 So.2d at 491; Hall v. Hilbun, 466 So.2d 856 (Miss. 1985); King v. Murphy, 424 So.2d 547 (Miss. 1983).
[G]iven the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options.
*1355 Hall, 466 So.2d at 873. Case law generally "demands" that "in a medical malpractice action, negligence cannot be established without medical testimony that the defendant failed to use ordinary skill and care." Hull, 516 So.2d at 491; see also Walker v. Skiwski, 529 So.2d 184, 187 (Miss. 1988) ("Our general rule is that the negligence of a physician may be established only by expert medical testimony.") (citing Cole v. Wiggins, 487 So.2d 203, 206 (Miss. 1986)). Expert testimony is required unless the matter in issue is within the common knowledge of laymen. Walker, 529 So.2d at 187; Hull, 516 So.2d at 491; Cole v. Wiggins, 487 So.2d 203, 205 (Miss. 1986); Clayton v. Thompson, 475 So.2d 439, 443 (Miss. 1985); Hall, 466 So.2d at 856; Kilpatrick v. Mississippi Baptist Medical Center, 461 So.2d 765 (Miss. 1984). An expert is necessitated to identify the action or inaction which allegedly constituted a breach of duty and which proximately caused the patient's injury. Hull, 516 So.2d at 491; Hall, 466 So.2d at 870-73. Once a witness is determined to be qualified to render expert testimony, questions of weight and credibility of the testimony are determined by the trier of fact. See, e.g., Brown v. McQuinn, 501 So.2d 1093 (Miss. 1986).

2. Summary Judgment: The Procedure
The construction and enforcement of the provisions of Rule 56, regarding summary judgment, have been amply addressed in a litany of recent cases. See Brown v. Credit Center, Inc., 444 So.2d 358 (Miss. 1983) (providing a detailed analysis of Rule 56 construction and enforcement). Therefore, only the nuances of summary judgment procedure delineated in Brown's progeny will be noted.
In a summary judgment hearing, "[t]he burden of producing evidence in support of, or in opposition to, [the] motion ... is a function of [Mississippi] rules regarding the burden of proof at trial on the issue in question." Fruchter v. Lynch Oil Co., 522 So.2d 195, 198 (Miss. 1988) (citing Galloway v. Travelers Ins. Co., 515 So.2d 678, 683 (Miss. 1987)); see also FED.R.CIV.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265, 273 (1986). The movant bears the burden of persuading the trial judge that: (1) no genuine issue of material fact exists, and (2) on the basis of the facts established, he is entitled to judgment as a matter of law. See Pargo v. Electric Furnace Co., 498 So.2d 833, 835-36 (Miss. 1986), and Smith v. Sanders, 485 So.2d 1051, 1054 (Miss. 1986), cited in Fruchter, 522 So.2d at 198; see also Pearl River County Bd. v. South E. Collection, 459 So.2d 783, 785 (Miss. 1984). The movant bears the burden of production if, at trial, he "would [bear] the burden of proof on th[e] issue" raised. Webster v. Mississippi Publishers Corp., No. 07-58372 (Miss. Dec. 20, 1989) (WESTLAW: 1989 WL 160452); see Fruchter, 522 So.2d at 198 ("refining" the rule pronounced in Brown v. McQuinn, 501 So.2d 1093, 1095 (Miss. 1986), and Shaw v. Burchfield, 481 So.2d 247, 252 (Miss. 1985)).
In sum, "[n]one of [the foregoing analysis] changes [the movant's] burden, once the facts are on the table, of persuading the [c]ourt (1) that there is no genuine issue of material fact and (2) that [the movant] is entitled to judgment as a matter of law." Webster v. Mississippi Publishers Corp., No. 07-58372 (Miss. Dec. 20, 1989) (WESTLAW: 1989 WL 160452).
In a negligence action, the plaintiff bears the burden of producing evidence sufficient to establish the existence of the conventional tort elements of duty, breach of duty, proximate causation, and injury. Therefore, in a summary judgment proceeding, the plaintiff must rebut the defendant's claim (i.e., that no genuine issue of material fact exists) by producing supportive evidence of significant and probative value; this evidence must show that the defendant breached the established standard of care and that such breach was the proximate cause of her injury. Accord Fruchter, 522 So.2d at 198; see Smith v. First Fed. Sav. & Loan Ass'n of Grenada, 460 So.2d 786, 792 (Miss. 1984), cited in Shaw, 481 So.2d at 252. See also Union *1356 Planters Nat'l Leasing, Inc. v. Woods, 687 F.2d 117, 119 (5th Cir.1982).
Mere allegation or denial of material fact is insufficient to generate a triable issue of fact and avoid an adverse rendering of summary judgment. Sanders, 485 So.2d at 1054; Hill v. Consumer Nat'l Bank, 482 So.2d 1124, 1128 (Miss. 1986), cited in Fruchter, 522 So.2d at 198-99. More specifically, the plaintiff may not rely solely upon the unsworn allegations in the pleadings, or "arguments and assertions in briefs or legal memoranda." Magee v. Transcontinental Gas Pipe Line Corp., 551 So.2d 182, 186 (Miss. 1989); Hill, 482 So.2d at 1128-29; First Fed. Savs. & Loan Ass'n, 460 So.2d at 791-92; Transurface Carriers, Inc. v. Ford Motor Co., 738 F.2d 42, 46 (1st Cir.1984); Watts v. United States, 703 F.2d 346, 353 (9th Cir.1983); 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2739 (1983).
The "party opposing the motion must by affidavit or otherwise set forth specific facts showing that there are indeed genuine issues for trial." Fruchter, 522 So.2d at 199 (citing Matter of Launius, 507 So.2d 27, 30 (Miss. 1987); First Fed. Savs. & Loan Ass'n, 460 So.2d at 792). "To have power to generate a genuine issue of material fact," the "affidavit or otherwise" (e.g., depositions and answers to interrogatories) must: (1) be sworn; (2) be made upon personal knowledge; and (3) show that the party providing the factual evidence is competent to testify. Magee, 551 So.2d at 186 (citing MISS.R.CIV.P. 56(e); In re Estate of Smiley, 530 So.2d 18, 25-26 (Miss. 1988); Walker v. Skiwski, 529 So.2d 184, 186 (Miss. 1988); Bush v. Mullen, 478 So.2d 313, 315 (Miss. 1985); Brown, 444 So.2d at 364).

3. The Law Applied to the Case Sub Judice
In the summary judgment proceeding in the case sub judice, Wooten bore the burden of persuading the judge that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. Through affidavit or other means, Wooten needed to present some evidence showing that proof of one or more of the elements of negligence is absent or insufficient. If Wooten met his burden, Palmer was required to rebut by producing significant, probative evidence establishing that Patricia's death was proximately caused by Wooten's negligence. Mere allegation or denial of material fact is insufficient; Palmer must have set forth by affidavit or other means specific facts showing that triable issues of fact exist.
Wooten filed his motion for summary judgment with supportive documents. These documents include: (1) the pleadings; (2) an affidavit of Buckley; (3) an affidavit of Kent, his expert witness; (4) his own affidavit; and (5) a copy of the death certificate of Patricia. Perusal of these documents clearly supports the conclusion that Wooten met his burden of persuasion. The burden then shifted to Palmer but, according to the trial judge, Palmer failed to sustain her burden for three reasons  each of which is independent of the other. These reasons are analyzed in the following subsections.

a. Palmer failed to properly respond to discovery
The first reason for which the trial judge granted Wooten's motion concerned Palmer's failure to respond to discovery. Indeed, Palmer's conduct was so egregious that even a harsh sanction as dismissal may seem warranted. However, a dismissal on this basis under Rule 56 is procedurally erroneous.
Dismissal under Rule 56 can only be based on the insufficiency of evidence  not on violation of procedure. Imposition of sanctions for "failure to make or cooperate in discovery" is governed by Rule 37 (operation of this rule will be discussed in a subsequent section which addresses BRMC's motion to dismiss). Because other independent bases for granting summary judgment were relied upon, this error is deemed harmless.

b. Palmer's experts are unqualified and a genuine issue of material fact was not presented
The trial judge provided two more reasons or bases for granting summary judgment: *1357 disqualification of Palmer's experts and the failure to present a triable issue of fact. These bases will be considered together in this subsection.

i. disqualification of Palmer's experts
As stated, in negligence actions such as the one sub judice, expert medical testimony is generally a vital means to establishment of the plaintiff's prima facie case. Medical malpractice cases generally require expert witnesses to assist the trier of fact to understand the evidence. Kilpatrick v. Mississippi Baptist Medical Center, 461 So.2d 765, 768 (Miss. 1984). Hull, 516 So.2d at 491; Hall, 466 So.2d at 873-74. Most important, a plaintiff in a medical malpractice case must, through expert testimony, establish the applicable standard of care and a breach of that standard. Hawkins v. Ozborn, 383 F. Supp. 1389 (N.D. Miss. 1974); Kilpatrick v. Mississippi Baptist Med. Center, 461 So.2d 765 (Miss. 1984); Dazet v. Bass, 254 So.2d 183 (Miss. 1971); see also Cunningham v. Mitchell, 549 So.2d 955, 959-60 (Miss. Sept. 1989).
Once a trial judge determines that expert testimony will be of assistance to the trier of fact, Mississippi law requires that he determine whether the proffered witness is "qualified as an expert by knowledge, skill, expertise, training or education." Hall, 466 So.2d at 873, quoted in Hardy v. Brantley, 471 So.2d 358, 366 (Miss. 1985). That is, "an expert witness [must] be qualified before he ... may provide opinion evidence." Hardy, 471 So.2d at 366; see also Hall, 466 So.2d at 875; Pharr v. Anderson, 436 So.2d 1357, 1359 (Miss. 1983). The trial judge is afforded widest possible discretion. Dixon v. International Harvester Co., 754 F.2d 573 (5th Cir.1985); see also Barnes v. General Motors Corp., 547 F.2d 275 (5th Cir.1977) (discretion is broad); Wyeth Laboratories, Inc. v. Fortenberry, 530 So.2d 688 (Miss. 1988) (qualification of witness is within trial judge's discretion); Hardy, 471 So.2d at 366 (qualification determination "necessarily" involves trial judge's discretion). Unless an abuse of discretion is evident, the judge's determination will remain undisturbed on appeal. Illinois Cent. R.R. Co. v. Benoit Gin Co., 248 So.2d 426 (Miss. 1971); see Crawford v. Worth, 447 F.2d 738 (5th Cir.1977) (judge's determination of expert qualification is conclusive unless clearly erroneous); see also City of Mound Bayou v. Roy Collins Constr. Co., Inc., 499 So.2d 1354, 1360-61 (Miss. 1986) (trial judge's disqualification of engineer as expert affirmed); Pharr, 436 So.2d at 1359 (trial judge's disqualification of proffered medical expert affirmed).
In the case sub judice, the decision to disqualify Palmer's experts occurred during the summary judgment hearing  not during a trial; this fact, however, is inconsequential. The law empowers a trial judge to determine whether a proffered expert is qualified to testify and does not restrict exercise of this power to the trial stage only. That is, a judge has as much power to resolve doubts on the qualifications of proffered experts during the summary judgment stage as he has during the trial stage. And of course, the standard which this Court must apply when reviewing a trial judge's decision to disqualify remains unchanged  notwithstanding that the decision was made during the summary judgment stage. That is, this Court will determine whether the trial judge abused his discretion. In the case sub judice, discretionary abuse is not evident.
Mississippi law required the judge to determine whether Palmer's proffered experts are "qualified ... by knowledge, skill, expertise, training, or education." Hall, 466 So.2d at 873. The judge accordingly followed the rule of evidence enunciated in Hall v. Hilbun. Pursuant to Hall, a proffered expert must base his opinions  "regarding the conclusions (possible diagnoses or areas for further examination and testing) minimally knowledgeable and competent physicians in the same specialty or general field of practice would draw, or action they would take"  on "information reasonably available to the physician [defendant], i.e., symptoms, history, test results, results of the doctor's own physical examination, x-rays, vital signs, etc." Id. *1358 at 874-75. Moreover, a proffered expert must
[b]e familiarized with the facilities, resources, services and options available. This may be done in any number of ways. The witness may prior to trial have visited the facilities, etc. He may have sat in the courtroom and listened as other witnesses described the facilities. He may have known and over the years interacted with physicians in the area. There are no doubt many other ways in which this could be done but, significantly, we should allow the witness to be made familiar with the facilities (and customs) of the medical community in question via a properly predicated and phrased hypothetical question.
Id. at 875.
Once [the proffered expert] has become informed of the facilities, [the patient's medical data], etc. available to the defendant physician, the ... expert may be deemed qualified to express an opinion what the care duty of the defendant physician was and whether the acts or omissions of the defendant physician were in compliance with, or fell substantially short of compliance with, that duty.
Id.
The evidence in the case sub judice shows that Lamphier, Palmer's only proffered expert who is a medical doctor, lacked both knowledge and familiarity with the hospital or similar facility. A lack of knowledge is reflected in Lamphier's opinions which are mere conclusions devoid of factual bases. Specifically, medical records and other documents which Lamphier supposedly examined and relied upon in forming his opinion were neither produced during his deposition nor attached to his affidavits filed in opposition to the motion for summary judgment as mandated by Rule 56(e).[12] A lack of the required familiarity with the facility available to Wooten in his treatment of Patricia is reflected in Lamphier's testimony given during his deposition. He testified that he has never visited BRMC nor any other hospital in Mississippi or in the Gulf Coast region. He specifically admitted that he is unfamiliar with these facilities and their staff. And he currently has no affiliations with any hospital anywhere and has had no hospital privileges for the past nine years.
Notwithstanding these demonstrable deficiencies, Palmer emphasizes that Lamphier is qualified simply because he is a surgeon licensed in Massachusetts and New Hampshire. Additionally, Lamphier is a member of the "Medical, Legal, Malpractice Peer Review Foundation" [hereinafter Foundation], a corporation which consults with lawyers and insurance companies involved in medical malpractice suits. The trial judge, however, heeded this Court's advice: "[T]rial judges are admonished to ascertain that the [proffered] witness really is an expert in the particular field at issue[; n]ot every M.D. is a qualified expert in every malpractice case." Hall, 466 So.2d at 875 (emphasis added). Accordingly, Lamphier was adjudged unqualified to appraise the actions of Wooten, an oral surgeon, because  in addition to his (Lamphier's) lack of knowledge and familiarity with the hospital  he is neither a dentist nor oral surgeon and his Foundation has no affiliation with one.[13]
*1359 Based on the evidence examined thus far, this Court can conclude that the trial judge's decision was proper. Any doubt that such a conclusion is correct is expunged upon examination of the following revelations.
In 1974, Lamphier was a resident of Florida when he lost his license to practice in that State for professional misconduct  which involved deaths of some of his patients. Revocation of Lamphier's license stemmed from the findings of horrific and deplorable facts by Victor J. Martinez, M.D., hearing officer for the Florida State Board of Medical Examiners [hereinafter Board].[14] Eight counts of medical malpractice levelled against Lamphier led to the following conclusion by the hearing officer:
Timothy Andre Lamphier, M.D., is guilty of unprofessional conduct in that he departed from or failed to conform to minimal standards of acceptable and prevailing medical practice... .
Timothy Andre Lamphier, M.D., is guilty of making misleading, deceptive, untrue or fraudulent representations in the practice of medicine... .
Timothy Andre Lamphier, M.D., did employ a trick or scheme in the practice of medicine... .
Timothy Andre Lamphier, M.D., is guilty of unprofessional conduct... .
The Board adopted the hearing officer's conclusions. However, the Board modified the conclusions with the following amendment: "Timothy Andre Lamphier, M.D., is guilty of intentionally making misleading, deceptive, untrue or fraudulent representations in the practice of medicine" (emphasis added).
During the subsequent year, Lamphier petitioned the Board for restoration of his license to practice medicine in Florida; the Board rejected the petition. The rejection was based upon the following determination:
The original findings and conclusions noted above were admittedly not in dispute. In this light, questions were put to the practitioner wherein he admitted having made errors in his surgical judgment. Further, questions were put to petitioner concerning his past activities and present qualifications. The petitioner was unable to adequately respond to his past activities and, in fact, noted that numerous civil malpractice matters were settled and some were still pending in Dade County, Florida. With respect to present qualifications, the petitioner merely stated that he had been doing emergency room type work at Ontario Community Hospital in Ontario, California, and has engaged in surgery only as required by his emergency room duties. The petitioner noted that it was his intention to refrain from the type of surgery which caused him his original problems and revocation of license in the State of Florida. In fact, all surgical procedures and medical activities of the petitioner have been limited to his emergency room work as his application for surgery privileges at the Ontario Community Hospital outside of the emergency room is still pending and has not as yet been approved.
Throughout the entire proceedings, the petitioner was not able satisfactorily to relate to his peers any real insight into the matters of his surgical competence and surgical judgment to overcome the past events, as fully documented in the recommended order of 1974, which was the basis for license revocation, sets forth a most unfortunate and disgraceful series of events involving unprofessional conduct from which the citizens of this state must be protected (emphasis added).
*1360 Lamphier's testimony at the hearing regarding his "practice" in California seems prophetic; that State revoked his license in 1977. Lamphier subsequently lost his license to practice medicine in New York as well. And finally, Lamphier's deposition testimony reveals he has had at least twelve medical malpractice suits filed against him.
In sum, this Court holds that, in view of the evidence, the circuit judge's disqualification of Lamphier as an expert against these defendants was fully justified. Clearly, no discretionary abuse is evident. Accord In re Air Crash Disaster at New Orleans, La., 795 F.2d 1230, 1233 (5th Cir.1986) (trial judges' "reflexive" decisions "to let it all in" because jurors will give it the weight it deserves, "can mask a failure by the trial judge to come to grips with an important trial decision") (discussing abdication of judicial responsibility to question experts' qualifications).
In addition to Lamphier, Palmer proffers herself as an expert on Wooten's conduct. The evidence shows that Marilyn Palmer is a registered nurse; however, she has never worked in an intensive care unit in a hospital and has not worked in any hospital since 1966. In 1966, she was employed by Singing River Hospital in Pascagoula where she was a "drug room nurse," and from 1958 to 1959, she was an "operating room nurse" at Jackson County Hospital in Pascagoula.
Palmer did not explain how she may have acquired  through her limited nursing experiences  the "knowledge, skill, expertise, training or education" necessary to qualify her as an expert on the conduct of an oral surgeon. Hall, 466 So.2d at 873; Hardy, 471 So.2d at 366. Clearly, in view of her weak credentials, the judge did not abuse his discretion by disqualifying Palmer as an expert.[15]
As noted, in negligence actions such as the one sub judice, expert medical testimony is a vital means to establishment of the plaintiff's prima facie case. Wooten provided expert testimony and other evidence to establish his compliance with the applicable standard of care. Palmer rebutted by proffering the testimony of two witnesses who were properly disqualified as experts. Absent expert testimony, the record is devoid of significant, probative evidence from which a genuine issue of material fact may derive and, consequently, Palmer's claim must be rejected.[16] A recent decision in another medical malpractice case is poignantly supportive of this conclusion.
In Phillips v. Hull, 516 So.2d 488 (Miss. 1987), the defendant-physician moved for summary judgment and presented affidavits to substantiate his contention that he *1361 exercised the appropriate standard of care when he performed a surgical procedure. The plaintiff, however, presented no expert testimony establishing the converse of this contention and, consequently, the trial judge granted the physician's motion. On appeal, this Court rationalized its affirmation of the decision:
[A]ssuming we are in an area not within the common knowledge of laymen, absent expert medical testimony which (a) articulates the duty of care the physician owes to a particular patient under the circumstances, and (b) identifies the particular(s) wherein the physician breached that duty and caused injury to the plaintiff patient, the plaintiff's claim for negligence regarding the surgery must fail. The trial court was proper in dismissing, against all plaintiffs, the cause of action based upon negligent surgical procedures.
Id. at 491 (trial judge's decision to grant summary judgment was reversed in part on other grounds).
Finally, the foregoing discussion provides a predicate upon which three issues presented by Palmer on appeal may be resolved. Palmer asks "whether or not the [trial judge] erred in finding that [his] experts were not qualified to testify in opposition to [Wooten's] motion rather than allowing a jury to determine weight and credibility." See Issue No. 2 in Section III of this opinion, supra. The substance of this issue is perplexing; it does not relate even remotely to the facts discernible in the record. The decision that Palmer's proffered witnesses are unqualified to render expert opinions does not concern weight or credibility; rather, it concerns qualification. See MISS.R.EVID. 702; see also Appellant's Brief at 17-18 (where Palmer cites authority which is neither analogous nor persuasive).[17]
Through Issues 4 and 9, Palmer basically contends that the trial judge erred when he struck opinions of Palmer's experts. Palmer did not provide support for this contention, and the record and briefs are devoid of evidence showing discretionary abuse.

ii. failure to present a triable issue of fact regarding cause of death
Assuming, arguendo, that Palmer's proffered experts are qualified to testify, examination of the record reveals no evidence  particularly testimonial evidence  of significant and probative value establishing her allegation that Wooten's negligence proximately caused Patricia's death. Therefore, the conclusion that Palmer failed to carry her burden of rebuttal as required under Rule 56 remains valid; no triable issue of fact exists.
Palmer levelled numerous claims to support her negligence allegation. Palmer claimed that repair of Patricia's fractured *1362 jaw should have been delayed until her neurological condition improved, but the record reveals no evidentiary support. The decision to proceed with the surgery was not made by Wooten; it was made by Buckley, a neurosurgeon and Patricia's primary physician. Palmer's own expert, Lamphier, conceded that Buckley was the appropriate decision maker and that Wooten was correct to rely on Buckley's advice.[18] Palmer admits in her own brief that Buckley "found ... Patty was sufficiently stable neurologically to sustain oral surgery." Admission aside, evidence produced by Wooten shows no complications were encountered during or after the surgery. Indeed, Palmer's own expert, Lamphier, testified during his deposition that, based on information provided him, he knows of no complications that resulted during or after the surgery.
Palmer also claimed that the procedure employed to repair Patricia's jaw was improper. According to Palmer, Wooten should not, under the circumstances, have "wired" Patricia's mouth shut and that, having done so, should have provided post-operative instructions "that she was not to receive anything by mouth." Lamphier adds that "[Wooten] had a responsibility if he wired this girl's teeth together, that she be given nothing by mouth, because of the great danger of aspiration."[19] Palmer and her "expert" were obviously confused at this point. Evidence shows that Wooten did not "wire" Patricia's mouth shut; other than mere speculation, Palmer provides no evidence to the contrary. As described by Wooten, the procedure entailed placement of "two loose elastics ... one on the right and one on the left [side of Patricia's mouth] to simply encourage the jaw to stay closed. She could easily open it anytime she [needed] to vomit, to speak or to lick her lips or whatever function she desired." But see Appellant's Main Brief at 11 ("he wired[?] her mouth ... by placing rubber bands in her mouth"). The two elastics did not inhibit opening of her mouth. The discharge summary, written by Buckley, notes that Patricia was "conversive" after the surgery and spoke "in a rational way." In fact, Patricia did vomit on at least one occasion several days following the surgery, and she experienced no difficulty expelling the vomitus material.
The point of Palmer's allegation regarding the procedure to repair the jaw is unclear. Is Palmer claiming that the procedure proximately caused Patricia's death because her mouth was allegedly wired shut and, consequently, she was unable to expel vomitus material? If so, then this claim was not specifically enunciated, and an evidentiary basis is nonexistent. On the contrary, the medical records, Buckley's discharge summary, the autopsy, and the death certificate do not indicate that aspiration of vomitus material caused or contributed to Patricia's death. In sum, Palmer's claim  that the procedure to repair Patricia's jaw was improper  is without merit. Indeed, Palmer does not even delineate an alternative procedure which allegedly should have been employed.
In the pleadings, Palmer levelled another claim  that an ulcer was the cause of Patricia's death and that the "defendants ... negligently failed to exercise ... the degree of care and skill exercised by physicians and surgeons in like cases by failing to properly diagnos [sic] and treat the stress ulcer." The autopsy report, however, contradicts Palmer's unsubstantiated determination that an ulcer caused Patricia's death: "No clear cause of the cardiac arrest was determined." The report additionally concluded that "[n]o actual ulcerations [were] found" in the gastrointestinal tract. The death certificate did note that Patricia died of cardiopulmonary arrest "due to" a stress ulcer "as a consequence of" an automobile accident. This notation was written by an individual other than the pathologist who conducted the autopsy and is unsupported by the evidence presented in the record. But if Patricia did *1363 die of an ulcer, then Palmer's claim should nonetheless be rejected because she failed to present specific facts, as required under Rule 56, showing that Wooten breached the still undetermined standard of care and a relation between the breach of duty and the cause of Patricia's death. Fruchter, 522 So.2d at 199 (citing Matter of Lanius, 507 So.2d 27, 30 (Miss. 1987), and First Fed. Savs. & Loan Ass'n, 460 So.2d at 792). As stated, mere allegation or denial of material fact is insufficient to generate a triable issue of fact sufficient to avoid an adverse rendering of summary judgment. Sanders, 485 So.2d at 1054; Hill v. Consumer Nat'l Bank, 482 So.2d 1124, 1128 (Miss. 1986), cited in Fruchter, 522 So.2d at 198-99.
Finally, in addition to her unsubstantiated claims that aspiration or an ulcer caused Patricia's death, Palmer levelled yet another claim: that Patricia fatally choked on a "rubber band" which Wooten used in repairing the fractured jaw. The record is devoid of supportive evidence.
In sum, Palmer put forth numerous claims concerning the cause of Patricia's death, but failed to produce evidence of sufficient value to defeat Wooten's motion for summary judgment.

iii. failure to present a triable issue of fact regarding absence of informed consent
Palmer also claims that Wooten failed to inform Patricia or her family of the risks involved in the surgery. The trial judge determined  though without explanation  the claim was not sufficiently substantiated to defeat the motion for summary judgment on this issue.
The doctrine of informed consent represents the application to medical practice of principles of tort law. Thus, when a lack of informed consent is claimed, the plaintiff has the burden to prove by a preponderance each element of the prima facie case: duty, breach of duty, proximate causation, and injury. Hull, 516 So.2d at 492 (providing a detailed discussion on historical aspects of the "informed consent" doctrine and its development in Mississippi); see also P. APPELBAUM, C. LIDZ & A. MEISEL, INFORMED CONSENT: LEGAL THEORY AND CLINICAL PRACTICE 123 (1979).
When a physician-patient relationship exists, the physician owes the patient a duty to inform and obtain consent with regard to the proposed treatment. APPELBAUM, LIDZ & MEISEL, supra, at 123-24. Proving breach of duty requires more than mere allegation that the physician did not obtain informed consent.
For example, if the plaintiff's allegation (i.e., that her consent was not informed consent) is based on a failure to understand the information provided by the physician prior to being administered treatment, then she may need to show the information was too complex or too vague. Basically, this is a question of adequacy of the information provided. In a recent case, this Court delineated a "disclosure checklist" which should be useful in scrutinizing adequacy of information. Hull, 516 So.2d at 493. Pursuant to this list, a medical practitioner should disclose to a patient (or to the patient's guardian or representative): (1) a diagnosis, (2) nature and purpose of the treatment, (3) risks and consequences, (4) probable success of the treatment, (5) alternatives, and (6) prognosis if the treatment is not administered. Applicability of each item "may shift from case to case, depending upon the particular facts." See 11B P. LASKY, HOSPITAL LAW MANUAL: CONSENT TO MEDICAL AND SURGICAL PROCEDURES 38-39, cited in Hull, 516 So.2d at 493. Evidence that the physician complied with the checklist (or some variation) may be sufficient to defeat a claim of informational vagueness; however, a question may still remain with regard to informational complexity. The California Supreme Court aptly noted that the patient's interest is not in a "lengthy polysyllabic discourse," but in provision of relevant information in "lay terms." Cobbs v. Grant, 8 Cal.3d 229, 104 Cal. Rptr. 505, 502 P.2d 1 (1972); see also Gray v. Grunnagle, 423 Pa. 144, 223 A.2d 663 (1966) (Supreme Court held that consent was invalid because *1364 terminology used to obtain consent was too complex for patient to understand).
If the allegation of lack of informed consent is based on incompetency, the plaintiff may need to show, for example, that she was under the influence of an anesthetic when infomation was provided and consent obtained. See, e.g., Demers v. Gerety, 85 N.M. 641, 515 P.2d 645 (Ct.App. 1973) (consent invalid because obtained after awakening patient in middle of the night; patient had been administered sleeping pills earlier and was "groggy" when awakened); see Cahal & Cody, Consent and the Groggy Patient, 40 GENERAL PRACTITIONER 195 (1969).
If lack of informed consent is based on involuntariness, the plaintiff may need to show, for example, that she was pressured into signing a consent form or was under duress when consent was obtained. APPELBAUM, LIDZ & MEISEL, supra, at 179.
Recovery under the informed consent doctrine is circumscribed by numerous affirmative defenses. For example, the physician may not be required to inform the patient of unexpected[20] or immaterial[21] risks. Obtaining informed consent may not be necessary under circumstances involving an emergency (e.g., life or death situation),[22] incapacity (e.g., unconscious patient),[23] waiver (e.g., patient waived right to receive information),[24] and "therapeutic privilege" (e.g., disclosure would be harmful to patient).[25]
Once proof of duty and breach of that duty is provided, the plaintiff is required to produce evidence of two subelements of causation. First, the plaintiff must show that a reasonable patient would have withheld consent had she been properly informed of the risks, alternatives, and so forth. Hull, 516 So.2d at 493 (reaffirming Mississippi's adoption of the objective test); APPELBAUM, LIDZ & MEISEL, supra, at 121. And second, the plaintiff must show that the treatment was the proximate cause of the worsened condition (i.e., injury). That is, the plaintiff must show that she would not have been injured had the appropriate standard of care been exercised. Generally, proof of the latter sub-element requires expert testimony that the defendant's conduct  not the patient's original illness or injury  led to the worsened condition.
In the case sub judice, Palmer claimed lack of informed consent, but failed to produce any evidence of the doctrine's four elements. Conversely, the record contains two documents entitled: "Authorization for Medical and/or Surgical Treatment." Palmer's signature is affixed to both documents, which expressly authorized Wooten to "make an impression" of Patricia's teeth and to repair her fractured jaw. These documents also include a declaration by Palmer, who considers herself to be a medical expert, that she "fully understand[s] ... the reasons why [Patricia's] surgery is considered necessary, its advantages and possible complications, if any, as well as possible alternative modes of treatment, which were explained to me by Dr. James Wooten." Admittedly, the documents do not reveal the specific information disclosed and whether the information was adequate; however, the documents constitute some evidence supporting Wooten's *1365 claim that informed consent was indeed obtained. In another medical malpractice case before this Court, such evidence may have defeated a plaintiff's claim that her physician failed to obtain informed consent prior to negligently performing tubal ligation.
In Phillips v. Hull, the physician successfully moved for summary judgment on the issues of surgical negligence and failure to obtain informed consent. On appeal, this Court reversed in part on the issue of informed consent because "[n]o form in the record indicates the patient's consent was in fact an informed consent." 516 So.2d at 494 (emphasis added). "[I]n the absence of any documentary evidence substantiating [the physician's] claim of having obtained [his patient's] `informed' consent for the operation, this Court [can]not find that `the strength of [the movant's] showing is such that [she] is entitled to summary judgment as a matter of law.'" Id. (emphasis added and citation omitted).
In the case sub judice, Wooten clearly met his burden of persuasion by introducing "documentary evidence" indicating informed consent was obtained from Palmer, a self-proclaimed expert on oral surgery. Palmer's mere allegation to the contrary is insufficient rebuttal. Assuming, arguendo, that Wooten breached his duty to obtain informed consent, then evidence in the record must reflect a causal connection between breach of that duty and the death of Patricia. Reikes v. Martin, 471 So.2d 385, 392 (Miss. 1985), cited in Hull, 516 So.2d at 493. As discussed in the preceding subsection, Palmer has produced no significant, probative evidence showing a causal connection between the repair of Patricia's fractured jaw and her subsequent cardiac arrest. Thus, without more, this Court cannot conclude that summary judgment on this issue was improperly granted.

iv. miscellaneous issues
Palmer's negligence claim also stems from an out-of-state trip Wooten made on April 10, 1981. Palmer alleges Wooten "left the state without leaving any orders for [Patricia's] post operative care[; he] also left town without leaving a place or number whereby he could be reached or an oral surgeon in charge to continue his post operative care." This allegation is without merit simply because Wooten did not leave town until April 10  one day after Patricia experienced cardiac arrest.[26]
Wooten's post-operative care of Patricia included three visits  once following surgery on April 8 and twice on April 9. His last visit on April 9 occurred at approximately 6:00 p.m.; Patricia's cardiac arrest occurred the same day at approximately 11:40 p.m. Four physicians and numerous medical personnel on duty that night at the hospital responded when Patricia experienced the arrest. No evidence was presented in the record showing that Wooten was called for assistance. Not a scintilla of evidence of significant and probative value was produced showing the standard of post-operative care owed by Wooten and a failure to exercise that standard. More specifically, no evidence was produced showing that Wooten or anyone else could have foreseen the events which transpired on the evening of April 9 or, if the events were foreseeable, that preventative care could have been provided.
Finally, the testimony of Palmer's own proffered expert, Lamphier, exculpates Wooten.
Wooten: As I understand your response to my question, Doctor, you're saying, and my question was:

What did Dr. Wooten do wrong? And you answered by saying ...
Lamphier: (interrupting) Maybe I said too much; I'm sorry.

Wooten: I'm not worried about that. My question was: What did Dr. Wooten do wrong? And you answered by telling me that at 9:00 on the [9th] she vomited and no one did anything. Are you saying Are you saying *1366 that Dr. Wooten should have done something?

.....
Lamphier: No, Dr. Wooten was not there. Dr. ...
Wooten: (interrupting) Who should have done something?

Lamphier: In the ICU. They did nothing. They did absolutely nothing.

Wooten: All right.

Lamphier: They are a hundred percent responsible for that girl's death.

In sum, no evidence was adduced showing that Wooten was negligent in his rendering of post-operative care.

B. Whether or Not the Trial Judge Erred in Dismissing Palmer's Action Against BRMC
In this subsection, this Court considers the propriety of the judge's decision to dismiss Palmer's suit against BRMC and concludes that, in view of the facts, reversal is in order.

1. BRMC's Rule 12(b)(6) Motion
On October 18, 1983, BRMC filed a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim. The record and briefs contain allusions to the notion that the trial judge later treated the motion as one for summary judgment, through which the suit was dismissed. The record does not clearly indicate that this actually occurred. See, e.g., Vol. IV, at 571 & 732. Therefore, this Court in clear conscience cannot reach the issue of whether dismissal under Rule 56 was warranted. This is not to say that BRMC is precluded: (1) from seeking clarification from the trial judge on this matter; (2) from filing a Rule 56 motion in the future; or (3) from requesting that the Rule 12(b)(6) motion be treated as one for summary judgment under authority of Gray v. Baker, 485 So.2d 306, 307 (Miss. 1986). See also 2A MOORE'S FEDERAL PRACTICE ¶ 12.09[3] (2d ed. 1986).

2. BRMC's Rule 37 Motion
Palmer's failure for over three years to respond to BRMC's interrogatory regarding expert witnesses led to the judge's decision to dismiss the action against BRMC.

a. basis for the decision to dismiss
As noted in Section II(C)(2) of this opinion, BRMC propounded interrogatories to Palmer on May 12, 1983. On September 19, 1983  over four months after BRMC filed the interrogatories and nearly two months after BRMC filed a motion to compel a response  Palmer answered the interrogatories including No. 3 regarding expert witnesses, their opinions, and bases for their opinions. Palmer's answer to No. 3 revealed: "My attorneys have not decided which expert they will call." Palmer did not provide a supplemental answer to No. 3 until July 3, 1986, and August 22, 1986  over three years after BRMC filed the interrogatories and approximately four months after Palmer employed the experts. In fact, the answers were not supplemented until after: (1) BRMC filed its motion to dismiss, and (2) Lamphier was deposed by Wooten.[27]
Additional time to respond to BRMC's interrogatories was never requested. During the hearing on the motion. Palmer attempted to explain her failure to timely prosecute the case:
Trial Judge: My question is this: How come so long? [That is, why did it take you so long to supplement the defendant's expert interrogatories?]

Palmer: Your Honor, October of '83 Hall v. Hilbun was not decided and prior to [...]

Trial Judge: Tough.

Palmer: Yes sir, and we could not get an expert in Mississippi and its just that simple. There was no expert obtained until 1986.[28]

*1367 Trial Judge: You couldn't get an expert in Mississippi 
The trial judge was still perplexed by Palmer's inaction, so he later repeated his question and received a different answer:
Trial Judge: What took this so long?

Palmer: Your Honor, do you want me to answer some of that. I know that initially ...
Trial Judge: Nothing was done since October 26th of 1983.

Palmer: Let me say initially, this is when you have too many lawyers involved in too many things with too many active people, and I know initially I think David and I started out trying to set things and then he said, well I'm going to have to clear up certain things over here with Chuck. And then I think we had some minor problems with the hospital on they had changed or redesigned all of their, I believe, intensive care rooms... . There is a pile of things that went on and on and it's just to me it's basically a lack of ever being able to sit down and say this is how we're going to do it. We had too  clearly, too many chiefs and we didn't have any Indians in this case, is the way I look at what happened.

Trial Judge: I don't like it... . Let's get the show on the road. Let's either find out if there's something here or there ain't. If there ain't, let me dump it all and get rid of it. If there is, let's set it down for trial about a week or two after the [hearing is concluded].

At a later point, Palmer provided yet another reason for her procrastination: "[The case sub judice simply] got [put] on a back burner because of the Federal super docket that came in for one thing [a]nd some other state court cases." Clearly, good faith on Palmer's part for her failure to prosecute the case is absent.
An understandably-annoyed judge, upon concluding the hearing on BRMC's motion, dismissed the suit pursuant to the dictates of Rule 37 for violation of Rule 26(f)(1).

b. applicable law
Rule 26(f)(1), which pertains to "supplementation of responses" during discovery, dictates that:
[a] party is under a duty to seasonably supplement his response with respect to any question directly addressed to ... the identity of each person expected to be called as an expert witness at trial, the subject matter of which he is expected to testify, and the substance of his testimony.
See also Square D Co. v. Edwards, 419 So.2d 1327, 1328-29 (Miss. 1982). Under Rule 37(d), "[i]f a party ... fails ... to serve answers or objections to interrogatories ... after proper service of interrogatories ... the court in which the action is pending on motion may ... take any action authorized under ... this rule"  including dismissal of the suit. See also Rule 37(b)(2) (discussing possible sanctions). Rule 37(a)(3) specifically holds that "an evasive or incomplete answer is to be treated as a failure to answer." Palmer's failure to timely supplement the original "incomplete" answer was deemed by the judge as a total "failure to answer."
The power to dismiss for violations of rules of procedure "is inherent in any court of law or equity, being a means necessary to orderly expedition of justice and the court's control of its own docket." Watson v. Lillard, 493 So.2d 1277, 1278 (Miss. 1986) *1368 (case involving medical malpractice). In addition, imposition of sanctions including dismissal in these cases is necessitated "to protect the integrity of the judicial process." Kilpatrick, 461 So.2d at 765; see also Cunningham v. Mitchell, 549 So.2d 955 (Miss. 1989) (affirming dismissal of medical malpractice suit for failure to adhere to discovery rules); accord Boyd v. Lynch, 493 So.2d 1315 (Miss. 1986); Huff v. Polk, 408 So.2d 1368 (Miss. 1982); Clark v. Mississippi Power Co., 372 So.2d 1077 (Miss. 1977).
This Court is without authority to reverse the judge's decision unless discretionary abuse is shown. Kilpatrick, 461 So.2d at 767 ("In the imposition of sanctions, the trial court has considerable discretion in matters pertaining to discovery and its orders will not be disturbed in the absence of abuse of discretion.") (citing Clark, 372 So.2d at 1077; Harkins v. Paschall, 348 So.2d 1019 (Miss. 1977); Paulk v. Housing Auth. of City of Tupelo, 228 So.2d 871 (Miss. 1969)). Palmer does not allege discretionary abuse, she merely contends: (1) that "there was no order requiring [her] to supplement the answer to the interrogatory pertaining to experts," and (2) that "[n]o prejudice occurred to the [defendant]." Appellant's Brief at 26-27. Palmer cited no authority to support these contentions. A judge may, under the circumstances present in the case sub judice, impose a sanction of dismissal  absent a court order. Kilpatrick, 461 So.2d at 767; see Owens v. Whitwell, 481 So.2d 1071, 1077 (Miss. 1986) (this Court held in this medical malpractice case: "If a party totally fails to respond to an interrogatory or his response is of absolutely no substance, subsection (d) of § 13-1-237 requires no prior order before imposing sanctions") (quoting Denman v. Hardy, 437 So.2d 426, 429 (Miss. 1983)); Ladner v. Ladner, 436 So.2d 1366, 1370 (Miss. 1983) ("sanctions may be imposed for failure to supplement even without a prior court order"); see also State Highway Comm'n of Miss. v. Havard, 508 So.2d 1099, 1104 (Miss. 1987); 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2050 (1970). Palmer's other contention  that her failure to timely respond is not prejudicial and, thus, is curable  compromises judicial integrity, circumvents Mississippi Rules of Civil Procedure, and flies in the face of dictates enunciated by this Court.
For example, in Huff v. Polk, the trial judge thought he could "cure" the plaintiff's nonprejudicial violation of the discovery statute by simply granting a continuance. See 408 So.2d 1368 (Miss. 1982). This Court reversed and rationalized:
[B]y offering a continuance, the [trial] court is setting up a situation where either party to a cause in litigation may decide that he may not be ready for trial on the day it is set and wishes a delay. He could get one by not conforming to the ... discovery rules until the morning of the trial ... knowing that he would get a continuance... . We certainly cannot condone the possibility of a situation such as that being legalized.
Id. at 1371. The facts of Huff are analogous to those of the case sub judice. Palmer egregiously violated rules of procedure pertaining to discovery and was not even prepared for the hearing on the motions to dismiss  even though she had filed the suit nearly three years earlier.[29]
If Palmer's egregious procrastination were excused, this Court in essence would be holding that a party may violate rules of procedure so long as her opponent is not prejudiced. And if no further facts in this case were considered by this Court in its review of the trial judge's decision to dismiss, affirmation would be in order.

*1369 c. reversal necessitated
The facts recited in subsection II(C)(2) of this opinion reveal egregious procrastination or failure to expedite litigation by BRMC (as well by Wooten and Martin) which can neither go unnoticed nor be condoned.
The first instance of BRMC's procrastination concerns its failure to timely supplement Palmer's "Interrogatory No. 2." On March 30, 1983, Palmer propounded interrogatories to BRMC. On June 29, 1983, BRMC filed its answers. In response to Palmer's expert interrogatory ("No. 2"), BRMC noted: (1) "It has not been determined at this time what experts will be called at the trial to testify on behalf of this Defendant"; and (2) "The answer to this interrogatory will be supplemented as required by the Mississippi Rules of Civil Procedure." BRMC did not provide the supplemental answer until nearly three years later when it named Dr. Martin as its expert. BRMC's failure to file a supplemental answer to Interrogatory No. 2 in a timely fashion is clearly violative of the rules of civil procedure  the relevant provisions of which have been amply discussed in preceding subsections of this opinion. Such procrastination is also violative of the Uniform Circuit Court Rule 2.08 [hereinafter UCC Rule 2.08], which dictates that "[a]ll discovery shall be completed within 90 days from service of an answer by the applicable defendant[, and that a]dditional discovery time may be allowed with leave of Court upon written notice setting forth good cause for the extension."[30]
The other instance of procrastination concerns BRMC's virtual inaction from October 18, 1983 (when it filed a Rule 12(b)(6) motion) to June 11, 1986  nearly three years later (when it "emerged" to file a motion to dismiss under Rule 37).[31] Such inaction is violative of the Mississippi Rules of Professional Conduct. These rules are also applicable to the parties' failure to conduct discovery in a timely manner. Rule 1.3  entitled "Diligence"  dictates that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." The Comment to this rule expounds upon this provision:
A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal convenience to the lawyer... . A lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf... . A lawyer's workload should be controlled so that each matter can be handled adequately.
Perhaps no professional shortcoming is more widely resented than procrastination. A client's interests often can be adversely affected by the passage of time or the change of conditions... . Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness.
See also A.B.A. Code of Professional Responsibility Disciplinary Rule 6-101(A)(3) ("A lawyer shall not ... neglect a legal matter entrusted to him."); id. 7-101 ("[shall] represent[] a client zealously"). Mississippi Rules of Professional Conduct 3.2  entitled "Expediting Litigation"  dictates that "[a] lawyer shall make reasonable *1370 efforts to expedite litigation consistent with the interests of the client." The Comment to this rule expounds upon this provision:
Dilatory practices bring the administration of justice into disrepute. Delay should not be indulged merely for the convenience of the advocates, or for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose. It is not a justification that similar conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay. Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client.
In sum, this Court has recognized the right of a trial judge to impose sanctions upon a plaintiff who was dilatory in the prosecution of his suit. See, e.g., Harris v. Fort Worth Steel & Machinery Co., 440 So.2d 294, 296 (Miss. 1983) ("Trial courts have inherent authority and duty to control their dockets for orderly disposal of business."). However, in deciding to impose a drastic sanction as dismissal, the defendant's own dilatory conduct may become a relevant and mitigating factor if deemed outside the realm of reasonableness and acceptability; such considerations should be made on an ad hoc basis. In other words, nothing in this opinion may be construed as holding defendants ultimately responsible for expedition of litigation; this responsibility is primarily the plaintiff's. This opinion may be construed simply as holding that a defendant's own procrastination becomes relevant only when the plaintiff's procrastination is being characterized (by the defendant) as unacceptable. This is analogous to the "clean hands" doctrine: "[N]o person as a complaining party can have the aid of a court ... when his conduct with respect to the [matter] in question has been characterized as wilful inequity." O'Neill v. O'Neill, 551 So.2d 228, 233 (Miss. 1989). Such conduct compromises judicial integrity and cannot be tolerated. But for the defendants' own procrastination and "bad faith" in expediting litigation, dismissal of Palmer's suit under Miss.R.Civ.P. 37 would have been warranted. The decision to dismiss under Rule 37 is therefore reversed.

V. CONCLUSION
On the basis of the foregoing discussion, this Court holds that the trial judge's decision to dismiss Palmer's suit against Wooten was proper under Rule 56 and, therefore, is affirmed. This Court further holds that the decision to dismiss Palmer's suit against BRMC under Rule 37 was improper and, therefore, is reversed and remanded for proceedings not inconsistent in Section IV(B), supra, of this opinion.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, ANDERSON and PITTMAN, JJ., concur.
BLASS, J., not participating.
NOTES
[1] For convenience and avoidance of confusion, feminine pronouns refer to plaintiffs and patients, and masculine pronouns refer to defendants and physicians. In addition, the term "physician" includes all persons possessing an M.D. or D.D.S. and providing medical, dental, or surgical services. Finally, the term "treatment" includes surgical procedures and any other forms of medical services.
[2] Wooten was misidentified by Palmer as an "M.D." (Medical Doctor); Wooten is a "D.D.S." (Doctor of Dental Surgery).
[3] Exchanges between Martin and Palmer (e.g., motions and requests pertaining to discovery) will not be addressed in this opinion.
[4] Dates noted in this opinion derive from the filing date stamped on the documents in the record. In some instances, these dates do not correspond with dates noted by the parties or trial judge. The differential time between the conflicting dates are, at most, a few days.
[5] At the time Patricia was admitted to the hospital, BRMC was known as Howard Memorial.
[6] "Cardiopulmonary arrest" is defined as "[a] sudden stoppage of the heart, blood circulation, and respiration (breathing)." 1 J.E. SCHMIDT, ATTORNEYS' DICTIONARY OF MEDICINE AND WORD FINDER 81 (Supp. 1989).
[7] "Stress ulcer" is defined as "[a] peptic ulcer that results from prolonged emotional stress." 3 J. SCHMIDT, ATTORNEYS' DICTIONARY OF MEDICINE AND WORD FINDER S-225 (1989).
[8] Wooten's deposition was not taken until July 1, 1986  nearly three years after Palmer filed his supplemental answers and nearly five months after Wooten filed a motion for summary judgment.
[9] This order was the product of a stipulation between Palmer and BRMC.
[10] On August 22, 1986, Palmer filed another supplemental answer in which he named another expert  Susan Armstrong Screws, a registered nurse in Louisiana.
[11] Mississippi law regulating professional liability of physicians has greatly evolved over the past decade. For a detailed analysis of the historical aspects of the law, see generally Hall v. Hilbun, 466 So.2d 856 (Miss. 1985).
[12] Pursuant to Rule 56(e):

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matter stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.
[13] Lamphier's membership in the Foundation lends no support for the contention that he is qualified to judge Wooten's actions. Lamphier admitted that he is the sole member of the Foundation which he created. And over the past decade, his Foundation has allegedly been employed in only eleven or twelve unnamed malpractice suits. The nature and extent of the Foundation's involvement in these dozen or so cases are questionable. Lamphier did state that his Foundation was engaged by a "corporation up in Virginia" to evaluate cases for legal purposes. He explained that the Virginia corporation  the name of which he couldn't even recall  sent him "two or three thousand cases to evaluate," but that the corporation abruptly ended its "affiliation" with him upon deciding it "wouldn't use doctors anymore." Such testimonial ambiguity leaves important questions unanswered. For example, Lamphier failed to explain if  prior to being disaffiliated with the corporation  he actually evaluated the cases and to what extent. Assuming, arguendo, that his involvement in evaluation of these cases was extensive proves nothing about Lamphier's qualification as a medical expert in the case sub judice. Anyone can "evaluate" anything; the critical question is whether the evaluator is qualified to evaluate and render an opinion on the basis of the evaluation.
[14] The facts which led to the eight-count charge against Lamphier were well-documented in the record.
[15] For similar and valid reasons, the trial judge disqualified Susan Armstrong Screws, a registered nurse in Louisiana, who was proffered as an expert adverse to BRMC's interest. No abuse of discretion is alleged by Palmer nor evident.
[16] At this point, an issue presented by Palmer may be addressed: Whether or not the lower court erred in not allowing plaintiff to thoroughly question defendant Wooten at the summary judgment hearing to establish the standard of care pursuant to Pharr v. Anderson. Palmer failed to address this issue in his brief; therefore, this Court could decline to consider it under authority of the following case decisions. Read v. Southern Pine Elec. Power Ass'n, 515 So.2d 916 (Miss. 1987) (party failed to cite authority supportive of its challenge to expert witness; therefore, this Court declined to consider the issue on appeal); Devereaux v. Devereaux, 493 So.2d 1310 (Miss. 1986) (this Court declined to address issue for which no supportive authority was cited); Nelson v. Clanton, 263 So.2d 787 (Miss. 1972) (this Court held that the plaintiff's failure on appeal to authoritatively support contention that she was entitled to peremptory instruction justifies reviewing court's decision to decline consideration of the issue).

Procedural bar aside, a thorough examination of the record reveals an absence of merit. Palmer was not precluded from questioning Wooten for the purpose of establishing the applicable standard of care. Assuming, arguendo, that Palmer was unduly stymied from questioning Wooten during the hearing leads to the same conclusion  that the contention is without merit. An unlimited opportunity to question Wooten on the standard of care issue was provided during Palmer's deposition of him. Palmer was also provided ample time and opportunity during the three-and-one-half years after he filed the suit to establish the standard through other means  e.g., through expert testimony or case law.
[17] For example, Palmer cites Brown v. McQuinn, 501 So.2d 1093 (Miss. 1986), a medical malpractice case in which the trial judge granted the defendant's motion for summary judgment based on the determination that the proffered witnesses were unqualified to render an expert opinion. On appeal, this Court reversed and remanded after holding that "[t]he credibility, weight and worth of [the experts' testimony] is [sic] for the jury to decide." Id. at 1096.

Palmer's citation of Brown reflects a misunderstanding of the issue in the case sub judice. The issue is not whether a jury should determine credibility or weight of the testimonial evidence of Palmer's experts. Rather, the issue is whether the trial judge abused his discretion by disqualifying Palmer's experts.
In Brown, this Court first scrutinized the trial judge's determination that the plaintiff's proffered medical experts were unqualified. This Court: (1) found that the credentials of the proffered experts were sufficiently "eminent"; (2) overruled the judge's determination to disqualify; and (3) held that the jury should next determine weight or credibility of the experts' testimony. Id. at 1095. In the case sub judice, "eminent" credentials are unequivocally absent. In addition, Palmer failed to show discretionary abuse by the judge. Palmer simply attempted to avert this hurdle with a cursory statement that his experts were qualified "[p]ursuant to this Court's decision" in Brown. See Appellant's Brief at 17-18. Palmer cannot challenge the weight-or-credibility-of-expert-testimony hurdle without first meeting head-on the qualification-of-proffered-expert hurdle. Accord In re Air Crash Disaster at New Orleans, La., 795 F.2d 1230, 1233 (5th Cir.1986) (trial judges' "reflexive" decisions "to let it all in" because jurors will give it the weight it deserves, "can mask a failure by the trial judge to come to grips with an important trial decision") (discussing abdication of judicial responsibility to question experts' qualifications).
[18] That Palmer holds Wooten and BRMC, and not Buckley, responsible for Patricia's death is curious logic in light of the evidence presented.
[19] "Aspiration" is the act of "sucking into the airways of fluid or foreign body, as of vomitus." T. STEDMAN, STEDMAN'S MEDICAL DICTIONARY 132 (5th ed. 1984).
[20] See, e.g., Reiser v. Lehner, 641 P.2d 93 (Utah 1982) (physician was not negligent for failing to inform of risk of cardiac arrest during amniocentesis since prior cases revealing risk were nonexistent).
[21] See, e.g., Henderson v. Milobsky, 595 F.2d 654 (D.C. Cir.1978) (physician not negligent for failing to inform where risk of permanent loss of sensation in small section of face from wisdom teeth extraction was 1 chance in 100,000).
[22] Compare Keogan v. Holy Family Hosp., 95 Wash.2d 306, 622 P.2d 1246 (1980) (truly exigent circumstances warranted treatment without consent), with Dewes v. Indian Health Serv., 504 F. Supp. 203 (D.S.D. 1980) (circumstances insufficient to support claim of exigency).
[23] See Meisel, The "Exceptions" to the Informed Consent Doctrine: Striking a Balance Between Competing Values in Medical Decisionmaking, 1979 WIS. L. REV. 413.
[24] Id.
[25] Id.; APPELBAUM, LIDZ & MEISEL, supra, at 127.
[26] After Patricia experienced the cardiac arrest, she slipped into a coma from which she never recovered. Wooten was in town before, during, and after these events.
[27] BRMC did, nonetheless, attend the deposition of Lamphier which was held in Massachusetts. Because Palmer did not supplement his answer to No. 3 until after the deposition, BRMC was not afforded an opportunity to cross-examine Lamphier with regard to his opinions and bases for his opinions.
[28] Palmer may be referring to an allegedly "gray" period for the legal profession in Mississippi when the law  (a) regarding the standard of care applicable to physicians in medical malpractice cases and (b) the matter of how expert witnesses may be qualified in such litigation  was in a state of transition. That is, the "locality" rule of evidence enunciated in Dazet v. Bass, 254 So.2d 183 (1971) was expanded in King v. Murphy, 424 So.2d 547 (Miss. 1983). Several years later, this Court in Hall v. Hilbun refined and elaborated upon the rule enunciated in King. See Section IV(A)(1) of this opinion.

Assuming, arguendo, that this was a legitimate excuse for her delay in prosecuting this case, she nonetheless was provided ample time and opportunity after Hall was decided to secure a qualified expert in accordance with the current and clear rule of evidence. Specifically: (1) Hall was decided on February 27, 1985; (2) The hearing in the case sub judice was concluded on October 6, 1986; (3) Thus, Palmer was provided twenty months  post-Hall  to search and find a witness qualified to render an expert opinion on the conduct of the defendants.
[29] Notably, Palmer did introduce medical records at the hearing in opposition to Wooten's motion for summary judgment. However, neither Palmer nor Wooten had reviewed the records. Palmer served BRMC with a subpoena on the day before the hearing and requested BRMC to bring to the hearing "all records pertaining to the hospitalization of [Patricia]." Thus, the records were seen by Palmer and Wooten for the first time upon being submitted during the hearing as evidence. The trial judge had to recess the hearing long enough to provide the parties an opportunity to review them.
[30] At the time the suit was filed, Rule 2.08 provided only a forty-five day time period within which discovery had to be completed  absent an order granting an extension of time.
[31] The record does contain a letter (dated February 22, 1984) from BRMC to Palmer revealing that some communication between the parties did transpire during the "quiet" period (i.e., between October 18, 1983 and June 11, 1986). The letter's content also reflects a lackadaisical attitude on the part of the parties to expedite discovery or any other action. Consider the following excerpt from the letter:

It is my understanding since you could never get C.R. McRae [Palmer's counsel] to agree to any definite dates which you and I discussed, you have taken a "hands-off" attitude towards scheduling ... depositions ..., leaving this to C.R. McRae.
As I explained to you in our telephone conversation, I have commitments in March which prohibit me from scheduling any depositions, followed by a trial the first week in April, which should take up a week.... If any dates are selected [by Palmer] after the first week in April, I will have to clear same with [the parties to be deposed].