# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00842-COA

**UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**                     APPELLANT

**v.**

**KRISTY GIDDENS, INDIVIDUALLY AND ON**                     APPELLEE
**BEHALF OF ALL WRONGFUL DEATH**
**BENEFICIARIES OF ISCAH RUMBLE,**
**DECEASED**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/26/2024 |
| TRIAL JUDGE: | HON. ADRIENNE ANNETT HOOPER-WOOTEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | LANNY R. PACE<br>ANNA MARIE LIVINGSTON |
| ATTORNEYS FOR APPELLEE: | JOHN S. GRANT IV<br>GREGORY MALTA |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 09/30/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., EMFINGER AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1. Kristy Giddens sued the University of Mississippi Medical Center (UMMC) after her daughter, Iscah Rumble, died following an atrial septostomy performed during a diagnostic heart catheterization. Following a bench trial, the trial court found that Giddens had not given informed consent to the atrial septostomy and that the failure to secure Giddens' informed consent was a breach of the standard of care. The trial court also found that UMMC's doctor's decision to perform an atrial septostomy was also a breach of the standard of care.

The court awarded Giddens damages according to the Mississippi Tort Claims Act (MTCA).

¶2.     UMMC appeals, arguing that the trial court's factual findings on liability and damages are against the weight of the evidence and that Giddens failed to provide sufficient proof to succeed on her claims. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

*Medical Background*

¶3.     Seventeen-year-old Iscah went to UMMC for a consultation about her elevated blood pressure and died seventeen days later at Texas Children's Hospital following complications from a procedure performed at UMMC. Iscah's family first learned of her blood pressure issues when she went to have her wisdom teeth removed. Once the oral surgeon placed her under anesthesia, he noticed that her blood pressure was elevated, and he decided not to go forward with the procedure. When Iscah woke, the surgeon advised her and her family to see her pediatrician about her blood pressure. Iscah's pediatrician prescribed a blood pressure medication and a fluid pill, and her family began regularly monitoring her blood pressure. These interventions appeared to help with her blood pressure numbers, but a later scan of her organs suggested that her heart pressure was elevated. Iscah's doctors referred her to UMMC to see a pediatric cardiologist.

¶4.     Iscah arrived at UMMC for an initial consultation on a Friday. Doctors discovered that the "pressures in her heart were elevated," and the physicians recommended an echocardiogram. After the echocardiogram, the physicians suggested further testing, and Iscah was admitted to UMMC for the weekend. Giddens testified that she first learned of

Iscah's pulmonary hypertension diagnosis on that Friday. Doctors explained that the condition was not curable but that it could be monitored with medication and that she might later need a heart or lung transplant. At that time, they did not have a treatment plan.

¶5. On Monday, the physician recommended that Iscah undergo a heart catheterization "to go in and see and measure the pressures in her heart." Giddens testified that Iscah's procedure had been described to her as a diagnostic procedure, which she understood to mean that doctors would observe "what was going on" and then make a plan for treatment following the procedure. Giddens testified that she was told that Iscah would be able to go home that night after the catheterization.

¶6. Dr. Sarosh Batlivala, a pediatric cardiologist, performed Iscah's catheterization. He testified that the goal of the catheterization was to determine the degree of her recently diagnosed pulmonary hypertension. During the catheterization, Dr. Batlivala immediately confirmed the diagnosis. Dr. Batlivala testified that during the procedure, he performed pulmonary vasodilator testing using oxygen and gasometric oxide to test "whether or not a patient will respond [to medical intervention] and how quickly they respond." Dr. Batlivala testified that Iscah did not respond to the testing, but he admitted that simply because a patient does not respond to the testing during the catheterization "does not mean they'll never respond" to medication. Dr. Batlivala also testified that a "fair number" of pediatric patients with pulmonary hypertension ultimately require lung transplants, which UMMC would not have been equipped to perform.

¶7. Dr. Batlivala believed that because Iscah was not responding to the pulmonary

vasodilator test, she was a candidate for an atrial septostomy procedure. Dr. Batlivala and other physicians testified at trial that an atrial septostomy involved making a small hole in the septum at the top of the heart to allow blood to flow across the heart. Babies in-utero naturally have a hole in the septum to allow circulation from the mother's body to the baby's. Dr. Batlivala testified that in most cases, the hole closes up naturally, but the ridge on Iscah's septum remained, which allowed doctors to perform the atrial septostomy.

¶8.     During the atrial septostomy, Iscah's myocardium was perforated by a needle. Iscah's blood pressure fell, and she began bleeding around her heart. Doctors immediately began chest compressions and tried to remove the excess blood around Iscah's heart. After roughly thirty minutes of chest compressions, Iscah was placed on an extracorporeal membrane oxygenation machine (ECMO), and compressions were stopped as Iscah became stable. Dr. Batlivala was able to remove the excess blood, and Iscah was transferred to the pediatric intensive care unit.

¶9.     A few days later, Dr. Jorge Salazar spoke with Giddens, Iscah's mother, and recommended they attempt a second atrial septostomy. Dr. Salazar explained to Giddens that the second atrial septostomy was a "life-saving effort." The second procedure did not have the hoped-for effect, and Iscah was transferred to Texas Children's Hospital, where they had a specialist for pediatric pulmonary hypertension who might be able to perform a lung transplant for Iscah. However, Iscah was not responsive once she arrived in Texas, and she passed away seventeen days after she was first admitted at UMMC.

*Bench Trial*

4

¶10. Giddens, acting as the representative for Iscah's estate, filed suit against UMMC in Hinds County Circuit Court, alleging that medical malpractice by UMMC's doctors led directly to Iscah's death.[1] After several years of litigation, the matter proceeded to a bench trial.

¶11. At trial, Dr. Batlivala testified that the catheterization revealed that Iscah's hypertension was "much more severe than [they] thought" and that the findings were unexpected. He said that her "cardiac output was low, which . . . mean[t] she's at risk for sudden death." Due to these unexpected findings, Dr. Batlivala decided it was necessary to perform the atrial septostomy. He testified that, ideally, the atrial septostomy would allow an additional pathway across Iscah's heart for her blood to flow to "maintain her circulation if she were to have a pulmonary hypertension crisis."

¶12. Dr. Batlivala said that he spoke with "multiple cardiologists" over the phone before beginning Iscah's atrial septostomy. He also testified that he "broke scrub" during the catheterization to speak with Giddens and get her consent before performing the atrial septostomy. Dr. Batlivala testified that a nurse called Giddens and asked her to come to the "cath lab" and that they spoke in the control room that was connected to the cath lab. Dr. Batlivala explained that it was "not typical" to call a parent back to the lab, but he wanted to do it because "it was such a severe case [that he] wanted to talk to the mother face-to-face." Dr. Batlivala testified that he had never broken scrub before during a procedure to get

---

[1] Giddens' complaint did not list informed consent as a cause of action. However, at trial, Giddens moved to conform the pleadings to the evidence and include a claim for informed consent. Although UMMC objected, the trial court ultimately allowed the amendment. UMMC does not appeal that decision.

consent for a family member, which was why he remembered the conversation so "vividly."

¶13. Time stamps from the cath lab log show that Giddens was called at 11:32 a.m., which Dr. Batlivala said was when he broke scrub. As he waited for Giddens, he spoke with two other cardiologists and the cardiac anesthesiologist who was in the lab. The log does not indicate that he spoke with the other doctors. Dr. Batlivala claimed that he spoke with Giddens for a few minutes about the procedure, and she consented. He did not have anyone witness the conversation, and he did not get her written consent, although there were consent forms nearby. Then Dr. Batlivala scrubbed back in, which he testified usually took two to three minutes. The log indicates that at 11:40, Dr. Batlivala was back in the lab to perform the procedure.

¶14. Dr. Batlivala did not know why he did not get a signed consent form from Giddens but explained that it "was a critical case and the patient was very sick" and that he "didn't want to leave for a long time." He admitted that the standard practice would have been to get a signed consent form but explained that sometimes there were "outstanding situation[s]" with "severely ill" patients who only need verbal consent. Dr. Batlivala admitted that Iscah's situation, though serious, was not an emergency.

¶15. He testified that it would be "malpractice" to scrub out while his patient was on the table "with catheters inside their body when [he was] the only person who's equipped to utilize them if something were to happen." He testified that this was the reason he could not and did not talk to Giddens for twenty minutes, but he remained adamant that he spoke with her for "a few minutes." Dr. Batlivala explained that the time stamps rely on the technician

6

who is working the monitor, so there could be a slight time difference between reality and the log.

¶16. Dr. Batlivala testified that he had performed many atrial septostomies at UMMC, but he admitted that they were more common for infants than seventeen-year-olds. He believed that the decision to perform the atrial septostomy was within the standard of care, and he testified that the perforation of the myocardium was a known complication of the procedure. He also claimed that he had disclosed this complication to Giddens during their conversation. He denied that there was a "preference" to try other medical interventions, like medicine or a lung transplant, over the atrial septostomy.

¶17. Giddens testified that she never spoke with Dr. Batlivala before the atrial septostomy and denied giving consent to the procedure. She testified that she had been told the heart catheterization was for diagnostic purposes only. Giddens said that she was in Iscah's patient room during the catheterization, and a nurse would call the room every fifteen to twenty minutes to give an update. At some point, Giddens realized that she had not heard from the nurse in nearly forty-five minutes, so she called the lab. Giddens then learned that doctors were performing chest compressions, but the nurse told her there was no reason to worry. Giddens testified that she began to cry because "'chest compressions' is a nicer way of saying CPR."

¶18. Giddens said she was never asked to come down to the lab, and she testified that she remained in the room all day. She denied that anyone called her from the lab and asked for consent to the atrial septostomy. Giddens also testified that she would not have consented to

the procedure because at that point in time, they were still trying to diagnose Iscah. She testified that no one spoke with her about the first atrial septostomy's risks or consequences, the probable outcome, or alternative treatments.

¶19. However, Giddens would later testifiy that she did consent to the second atrial septostomy, which was performed by Dr. Salazar, and that Dr. Salazar talked with her for up to thirty minutes about the procedure, answering her questions and explaining that the second atrial septostomy was a lifesaving effort. Alvin Giddens, Iscah's stepfather, testified to this as well.

¶20. Olivia Poag, the pediatric cath lab manager, testified that she was the "monitor nurse" during Iscah's procedure. Poag testified that this meant she was responsible for recording Iscah's vitals, keeping all supplies charged and ready, and documenting the procedure. She was also the one who called families during procedures, but she had no independent recollection of Iscah's procedure and used the cath lab log, which had been admitted as an exhibit, to refresh her memory.

¶21. Poag explained that when documenting a procedure, she could select pre-set information "to make sure that we're going down the lines and making sure we are doing all of our steps" or could manually type in information. She identified the two entries related to Giddens' giving consent that were manually entered, not pre-programmed. Poag testified that she only input information if it happened or if she was told it happened. She reiterated that she did not remember Dr. Batlivala scrubbing out or speaking to Giddens, and she did not remember calling Giddens and asking her to come down. But she testified that if the

8

information was in the log, then she must have put it there.

¶22. Poag testified that they had consent forms ready and on hand in the cath lab so that they could give them to patients or a patient's family if they came to the cath lab for discussion. Written or oral consent were both appropriate, but if there was oral consent—particularly over the phone—then the consent should be witnessed by a third party. She also testified that any procedure other than the planned one would require consent unless it was an emergency. Poag explained that consent requires informing a patient or designee about the risks and benefits of the surgery, the possibility of failure, why the procedure was necessary, and the prognosis.

¶23. Dr. Patricia Penkoske testified as Giddens' expert in pediatric cardiac surgery. Dr. Penkoske testified that her review of Iscah's medical records suggested that Iscah was not in critical condition at the time they decided to do her heart catheterization. Dr. Penkoske testified that other medical interventions should have been attempted before the atrial septostomy—first medicines and then a lung transplant. Dr. Penkoske said that "to a degree of reasonable medical probability," Iscah did not need a "rescue procedure" like an atrial septostomy. Dr. Penkoske testified that the decision to perform the atrial septostomy without first seeking other alternatives was a breach of the standard of care.

¶24. Dr. Penkoske also explained that for Giddens to have given informed consent for the procedure, she would need to be told "everything that is likely to occur," particularly if she had consented only to a diagnostic heart catheterization that then changed into a procedure with significant risk.

¶25. Dr. Anthony Chang, Giddens's other expert in pediatric cardiology testified via videotaped deposition. Dr. Chang testified that Iscah's medical records showed no symptoms related to her high blood pressure other than chronic headaches and lower-extremity swelling. He agreed that her blood pressure was not normal but emphasized that it was stable.

¶26. Dr. Chang testified that generally the goal of a heart catheterization on a patient with pulmonary hypertension was to perform a "pulmonary vasodilator trial run" to see if there was any reaction from the patient. He testified that an atrial septostomy was "typically . . . not done" during a catheterization: "Only in situations in which the patient is very symptomatic from pulmonary hypertension, despite very maximum non-medical therapy, . . . would we even consider" the atrial septostomy. Dr. Chang testified that the decision to perform the atrial septostomy on Iscah was not appropriate because she was stable, had not had any medical therapy, and was not symptomatic. Although Dr. Chang noted that Iscah had some headaches and swelling, he saw nothing to suggest that she had been passing out, which he would have considered a more troubling symptom of pulmonary hypertension. Dr. Chang testified to several different medicines that UMMC could have tried with Iscah before the atrial septostomy and testified that those options should have been tried and exhausted. Dr. Chang believed the risk to Iscah during the atrial septostomy outweighed any benefit "by a large margin." He did not believe that even a successful atrial septostomy would have helped Iscah, as she was already stable. Dr. Chang testified that the decision to perform the atrial septostomy was a breach of the standard of care.

¶27. Dr. Batlivala testified as an expert in pediatric intervention cardiology and disagreed

with Dr. Penkoske and Dr. Chang that the atrial septostomy was a breach of the standard of care. Dr. Batlivala testified that the heart catheterization showed that Iscah's heart was struggling to circulate enough blood, and the tests performed during the heart catheterization suggested that she would not respond to medicines.

¶28.    Dr. Batlivala admitted that atrial septostomies were more common in infants than older children and were "relatively uncommon" for a seventeen-year-old like Iscah. Despite this, he denied that there was a preference to try other medical interventions before the atrial septostomy.

¶29.    Dr. Benjamin Waller testified as UMMC's other expert in pediatric cardiology. Dr. Waller testified that although Iscah showed some early signs of heart failure in her echocardiogram, medication would not have been appropriate without more information and would require a heart catheterization. Dr. Waller testified that the decision to perform the atrial septostomy met the standard of care because the tests during the catheterization suggested that Iscah would not respond to certain medicinal treatments. However, Dr. Waller admitted that he had not seen the use of an atrial septostomy as an initial medical intervention before medical therapies like medicines, but he named one medical article that said it had been done. Dr. Waller admitted he had never performed an atrial septostomy as the initial treatment for pulmonary hypertension. He admitted that an atrial septostomy on an older child was "uncommon," but he still believed it was appropriate for Iscah because of her signs of "severe pulmonary hypertension." Dr. Waller agreed that although the situation was "severe," it was not an emergency.

11

¶30. Giddens testified that Iscah was in the eleventh grade at the time of her death. She had good grades and wanted to be a pediatric nurse. Iscah was a hard worker and worked at McDonald's after school and on weekends. She was highly involved in church and was part of a praise dance team. Giddens testified that she had been diagnosed with posttraumatic stress disorder after Iscah's death and still had a hard time being there for her family. Iscah's cousin Dominique Johnson also testified that Giddens was not herself and seemed angry all the time.

¶31. Dr. William Brister testified as an expert in finance, economics, and mathematical statistics. He testified that if Iscah had graduated from high school, the net present value of her estate's lost earnings over her working life would have been $517,249. If she attended some college but did not finish a degree, that figure would have been $610,128. If she completed an associate's (two-year) degree, the figure would have been $734,587. And if she completed a bachelor's degree, the net present value would have been $1,131,057. To reach these calculations, Dr. Brister assumed that Iscah would have worked for approximately 32.91 years after graduating high school. He did not compare her life expectancy numbers with those of someone who had pulmonary hypertension.

¶32. Dr. Waller testified that Iscah's life expectancy would have been less than three years if her pulmonary hypertension went untreated. If medical intervention helped, there would be a five-year expectancy for 90% of patients; if it did not help, then there was a 30% chance of a five-year survival. If Iscah had a lung transplant, then her five-year survival rate would be 50%.

¶33.    The trial court, sitting as the fact-finder, found that UMMC "through its doctors, breached its standard of care by not" securing Giddens' informed consent to the atrial septostomy. The court also found that the decision to perform an atrial septostomy was also a breach of the standard of care. The trial court agreed with Giddens' experts that the decision to perform the atrial septostomy was the proximate cause of Iscah's death.

¶34.    The court's order noted that "there was conflicting testimony concerning whether there was in fact informed consent" by Giddens, as Giddens maintained that she had consented to the catheterization only, while Dr. Batlivala testified that he paused the procedure, had a nurse summon Giddens, and then spoke with Giddens in the cath lab about the procedure. The court also noted that Poag testified there were two methods of obtaining informed consent—written and oral—and said that oral consent needed a witness and that written consent could be accomplished by a preprinted form that was on hand in the cath lab. There was no evidence that Dr. Batlivala obtained written consent or that anyone witnessed his alleged conversation with Giddens. The court found that Dr. Batlivala's claim that he spoke with Giddens and at least two other doctors about the procedure was not credible.

¶35.    The trial court also noted that there are situations when consent is not required, such as with unforeseen or inconsequential risks, or when the situation is emergent or life-threatening. But the trial court noted there was no testimony that Iscah's situation was emergent during the catheterization procedure. The trial court held that UMMC could not claim the "immunities from liability granted to those conducting genuinely emergent medical

procedures."

¶36. The trial court found that Giddens' experts provided a "substantial amount of evidence" to support their claims that informed consent was not obtained and that it was a breach of the standard of care to not secure informed consent.

¶37. The trial court then turned to the causation aspect. The court noted that Giddens testified that she would not have consented to the atrial septostomy because she thought the catheterization was just for diagnostic purposes. The trial court noted that Dr. Chang and Dr. Penkoske both testified that the treatment exacerbated Iscah's condition and that the atrial septostomy directly and proximately caused her death. Both doctors also noted that there was a "relatively positive" prognosis for Iscah's life expectancy with proper medical treatment.

¶38. As to damages, the court accepted Dr. Brister's testimony that the net present value of Iscah's likely loss of earnings was $610,128—the amount he noted that would have been based on a high school diploma and some college training. The court also found that the Giddens suffered $250,000 in pain and suffering. After UMMC filed a post-trial motion seeking to apply the statutory caps, *see* Mississippi Code Annotated section 11-46-15 (Rev. 2019), the trial court adjusted these findings to conclude that the estate was due $458,258 for economic loss and $41,742 for non-economic damages, totaling $500,000.

## ANALYSIS

¶39. UMMC raises five issues on appeal. First, UMMC argues that the trial court's findings regarding the lack of informed consent were against the weight of the evidence. Second, UMMC argues that Giddens did not prove that a "reasonable person would have

14

withheld consent" had she been asked. Third, UMMC argues that Giddens' informed-consent claim was not supported by expert testimony. We address these issues together.

¶40.    Fourth, UMMC argues that the trial court's finding that UMMC breached the standard of care by performing the atrial septostomy was against the overwhelming weight of the evidence. Fifth and finally, UMMC argues that the trial court's findings on economic damages were against the overwhelming weight of the evidence.

¶41.    When a trial court sits as fact-finder, we will reverse the trial court's decision "only . . . when the findings of the trial judge are manifestly wrong or clearly erroneous." *Est. of Sumrall v. Singing River Health Sys.*, 303 So. 3d 798, 809 (¶32) (Miss. Ct. App. 2020). "A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *City of Jackson v. Brister*, 838 So. 2d 274, 277-78 (¶13) (Miss. 2003). The trial judge, sitting as the trier of fact, "has the sole authority for determining the credibility of the witnesses." *Sumrall*, 303 So. 3d at 809 (¶32).

## I.    Informed Consent

¶42.    UMMC argues that Giddens' informed-consent claim fails for three reasons: one, because "the overwhelming evidence" showed that Dr. Batlivala obtained consent; two, because she did not prove that a reasonable person would not have consented to the procedure; and three, because she presented no expert testimony describing what was necessary to provide informed consent.

¶43.    The Supreme Court has explained that the "familiar tort elements apply" in an

15

informed consent case: duty, breach, causation, and damages. *Jamison v. Kilgore*, 903 So. 2d 45, 47 (¶7) (Miss. 2005). "The doctrine of informed consent represents the application to medical practice of principles of tort law. Thus, when a lack of informed consent is claimed, the plaintiff has the burden to prove by a preponderance each element of the prima facie case: duty, breach of duty, proximate causation and injury." *Palmer v. Biloxi Reg'l Med. Ctr. Inc.*, 564 So. 2d 1346, 1363 (Miss. 1990).

¶44.    "If there is a physician-patient relationship, the doctor automatically has the duty to inform and procure the consent of the patient as it relates to the proposed treatment." *Jamison*, 903 So. 2d at 47-48 (¶7). Although the physician owes her patients a duty to inform and obtain consent to treatments, proving a breach of that duty requires more than alleging that she did not obtain informed consent. *Id.* The plaintiff must show "two subelements of causation": that a reasonable person would have withheld consent had he been properly informed of the alternatives, risks, and benefits; and that the treatment was the proximate cause of the injury. *Jamison*, 903 So. 2d at 48 (¶9). Proving the first subelement—whether a reasonable person would have consented—does not require expert testimony. *Id.* at 49 (¶11).

¶45.    However, establishing the known risks of a procedure does require an expert opinion. *Id.* at 50 (¶17). If a plaintiff establishes that an unexpected result was a known risk of a procedure, then the plaintiff must establish whether the doctor had a duty to disclose it. *Id.* at (¶19). After that, the plaintiff must establish the "materiality of the risk," and "if a known risk is found to be material, then the question of causation must be addressed." *Id.*

16

### A. Obtaining Consent

¶46. In the present case, UMMC argues the trial court's finding that Giddens did not consent to the atrial septostomy is "against the weight of the evidence." But "[i]n a bench trial, the judge acts as the jury for purposes of resolving factual issues," and we will affirm if the judge's judgment is supported by "substantial credible evidence." *Delta Reg'l Med. Ctr. v. Taylor*, 112 So. 3d 11, 30 (¶54) (Miss. Ct. App. 2012). Clearly, the trial court resolved the factual discrepancy between Giddens and Dr. Batlivala in favor of Giddens, and the court's decision is supported by the record.

¶47. Dr. Batlivala testified that he left the cath lab to speak face-to-face with Giddens, and he emphasized how unusual it was for him to "break scrub" and leave the room. He went so far as to state it was the only time in his practice that he had ever stopped mid-procedure to get consent. He also testified that it would be "malpractice" for him to have left Iscah on the table without his immediate supervision for very long and explained that this was why he did not talk to Giddens for more than a few minutes. As noted, Giddens maintained that she was never called down to the cath lab, did not speak to Dr. Batlivala in person or over the phone, and did not know anything about the atrial septostomy until after Iscah had suffered cardiac arrest.

¶48. The trial court's order thoroughly explains why it found Dr. Batlivala's story to strain credulity, including the "very short time frame" in which he would have had to call Giddens, speak with her about the procedure, and consult with other physicians before performing the atrial septostomy. The court also noted that no other witness could corroborate Dr.

17

Batlivala's version of events. These findings go directly to the credibility of the witnesses, which is the province of the fact-finder. *See Sumrall*, 303 So. 3d at 809 (¶32). The trial court's finding that Giddens did not provide any consent, much less informed consent, to the atrial septostomy is supported by substantial credible evidence.

### B. Withholding Consent

¶49. Even accepting the trial court's finding that Giddens did not provide any consent to the atrial septostomy, our inquiry does not end. *See Palmer*, 564 So. 2d at 1363 ("Proving breach of duty [to inform and obtain consent with regard to the proposed treatment] requires more than mere allegation that the physician did not obtain informed consent.").[2] To succeed on a claim involving informed consent, the plaintiff must also show the two "subelements" of causation: one, "that a reasonable patient would have withheld consent had she been properly informed of the risks, alternatives, and so forth"; and two, "that the treatment was the proximate cause of the worsened condition (i.e., injury)." *Id.* at 1364. The first subelement does not require expert testimony; the second does. *Id.*[3]

¶50. UMMC argues Giddens did not show that a reasonable person would not have consented to the atrial septostomy performed by Dr. Batlivala because she consented to Dr. Salazar's performing the procedure days later. UMMC also argues no one testified that the

---

[2] We also note that "merely signing a consent form is not a guarantee of the patient's informed consent." *Whittington v. Mason*, 906 So. 2d 10, 15 (¶14) (Miss. Ct. App. 2004). So even if the trial court found that Giddens had consented to the procedure, there is no "guarantee" that consent was informed.

[3] As noted by Giddens, UMMC does not challenge the court's findings on the second subelement (that the atrial septostomy was the proximate cause of Iscah's injury).

reasons for Dr. Salazar's procedure were any different than Dr. Batlivala's. The trial court found that Giddens met her burden to show a reasonable person would not have consented to the atrial septostomy, and that finding is supported by substantial credible evidence.

¶51. Giddens testified that she would not have consented to the atrial septostomy on the day Dr. Batlivala performed it because Iscah was at UMMC for diagnostic purposes only, not treatment. She also explained that she agreed to the second atrial septostomy only because Dr. Salazar spent nearly thirty minutes talking through the procedure with her, and he explained that the second procedure was a "lifesaving effort." All experts agreed that Dr. Batlivala's atrial septostomy was not urgent, an emergency, or necessary to save Iscah's life at that time. This testimony is sufficient to differentiate the consent given to Dr. Salazar from whether a reasonable patient would have given consent to Dr. Batlivala.

¶52. Although expert testimony is not required, Giddens's expert witnesses testified that the atrial septostomy should not be performed before attempting medicinal interventions and were very rarely attempted at all on older children, like Iscah. This evidence supports a finding that a reasonable patient would not have consented to the atrial septostomy during a non-emergency, diagnostic heart catheterization as the first choice for treatment.

### C. Expert Testimony

¶53. UMMC argues Giddens did not present sufficient expert testimony to prove what information should have been conveyed to satisfy the requirement for informed consent. Specifically, UMMC argues there was no testimony about which risks were material. However, the Supreme Court has noted that the expert opinion is required "to establish what

19

are known risks of the procedure." *Jamison*, 903 So. 2d at 50 (¶17). "Once the known risks are enumerated, they can then be evaluated as to which are material." *Id.* at (¶16). A "known risk is one which would be known to a careful, skillful, diligent and prudent practitioner or specialist." *Dunn v. Yager*, 58 So. 3d 1171, 1200 (¶73) (Miss. 2011) (quoting *Jamison*, 903 So. 2d at 49 (¶10)). "If a known risk is found to be material and was not disclosed to the patient, then the question of causation must be addressed." *Id.* (emphasis and quotation marks omitted) (quoting *Jamison*, 903 So. 2d at 50 (¶19)).

¶54.    However, in the cases cited by UMMC and above, the issue was whether the disclosures that were given to the patients were sufficient. *See*, *e.g.*, *Johnson v. Burns-Tutor*, 925 So. 2d 155, 159 (¶¶19-21) (Miss. Ct. App. 2006) (patient "initialed several pages of pre-printed forms that informed her of the general surgical risks and the specific surgical risks" but presented no testimony whether her claimed injury was covered in those risks); *McMichael v. Howell*, 919 So. 2d 18, 22 (¶¶10-11) (Miss. 2005) (patient signed form acknowledging she had been informed of risks and complications; doctor testified he explained the risks; patient presented no expert testimony to show that her injury was a known, material risk); *Whittington v. Mason*, 906 So. 2d 10, 15 (¶¶10-12) (Miss. Ct. App. 2004) (patient claimed doctor did not disclose risk of testicle removal during a vasectomy but presented no expert testimony that testicle removal was a known risk).

¶55.    Here, the trial court found that no disclosure was made to Giddens before the procedure was performed. So it was not a matter of whether the information that was provided was sufficient because no information was provided.

20

¶56. Even so, the experts testified that Dr. Batlivala should have discussed "everything that is likely to occur," that there was a "significant risk" of perforation of the myocardium, that the expected outcome would not be significantly better, and that there was a medical-therapy alternative to the risky procedure. While the experts agreed that the breach of the pericardial sac was a known complication and therefore not a breach of the standard of care, there was no testimony that the risk of complication was conveyed to Giddens.

¶57. The trial court's findings as to the lack of informed consent are supported by substantial credible evidence.

## II. Breach of Standard of Care

¶58. UMMC argues the trial court's finding that UMMC breached the standard of care by performing the atrial septostomy—independent of the informed consent issue—is against the weight of the evidence. As noted, we will affirm the trial court's factual findings where they are supported by substantial credible evidence.

¶59. To prove medical negligence, a plaintiff must show by the preponderance of the evidence that (1) the defendant had a duty to conform to a specific standard of conduct to protect others against an unreasonable risk of injury; (2) the defendant breached that standard; (3) the defendant's breach was the proximate cause of the plaintiff's injury; and (4) the plaintiff was injured as a result of the breach. *S. Cent. Reg'l Med. Ctr. v. Regan*, 303 So. 3d 432, 438-39 (¶9) (Miss. Ct. App. 2020). "Medical negligence may be established only be expert medical testimony . . . . Not only must this expert identify and articulate the requisite standard that was not complied with, the expert must establish that the failure was the

21

proximate cause, or proximate contributing cause of the alleged injuries." *Id.* (quoting

*Henson v. Grenada Lake Med. Ctr.*, 203 So. 3d 41, 44 (¶8) (Miss. Ct. App. 2016)).

¶60.    The trial court found that UMMC breached the standard of care by performing the

atrial septostomy while "failing to recognize" the alternatives to the procedure.

Unsurprisingly, both of Giddens' experts testified to a degree of medical probability that Dr.

Batlivala violated the standard of care by performing the atrial septostomy on Iscah. Dr.

Chang testified that medicinal options should have been tried and "exhausted" before

considering the atrial septostomy and that failing to do so was a breach of the standard of

care. Dr. Chang explained that this duty was especially applicable to a patient like Iscah, who

was otherwise stable, asymptomatic, and significantly older than a patient who usually

undergoes an atrial septostomy. Dr. Penkoske also testified that other medical interventions

should have been considered before the atrial septostomy.

¶61.    Even UMMC's expert, Dr. Waller, testified that he had not seen the use of an atrial

septostomy before attempting medical therapy and could only cite one medical article

showing it had been done before. Dr. Waller also agreed that the atrial septostomy was

generally performed on infants, not seventeen-year-olds like Iscah.

¶62.    The trial court found that the decision to perform the atrial septostomy before other

medical interventions was a breach of the standard of care, and this finding is supported by

substantial credible evidence. Giddens' experts testified that atrial septostomies were not and

should not be performed on older children and should not be performed without first

attempting other medical interventions. Everyone—save Dr. Batlivala—agreed that the

decision to perform the atrial septostomy was the proximate cause of Iscah's death. Although the trial court found that UMMC breached the standard of care by not getting Giddens's informed consent before the procedure, this alternative ground of liability regarding the choice to perform it is also affirmed.[4]

### III. Damages

¶63. UMMC argues that the trial court's economic damages award was erroneous because it failed to take Iscah's reduced life expectancy into account. As noted, when the trial judge sits as the fact-finder, her findings are accorded deference and will not be reversed so long as they are supported by "substantial, credible, and reasonable evidence." *Brister*, 838 So. 2d at 277-78 (¶13).

¶64. Dr. Brister testified that the net present value of Iscah's loss of earnings over her lifetime would have been $610,128 assuming she completed some college but did not graduate, and that this figure would have been $517,249 if she completed high school and did not pursue college. He assumed a typical work-life expectancy, which he testified meant she would have worked for roughly 33 years. Both Dr. Chang and Dr. Penkoske testified that Iscah could have lived for many years if she had received proper medical therapy and maybe even a lung transplant. None of UMMC's witnesses testified to the contrary.

¶65. The trial court acknowledged all this testimony in determining that Iscah's estate was

---

[4] Although UMMC did not challenge the trial court's finding of proximate cause as it related to the second subelement of Giddens' informed-consent claim, the trial court's finding that the decision to perform the atrial septostomy was the proximate cause of Iscah's death satisfies the second subelement of an informed-consent claim.

due $458,258 for its economic losses.[5] This finding is supported by substantial, credible, and reasonable evidence, and we affirm.

## CONCLUSION

¶66.    We affirm the trial court's findings as to UMMC's liability and the award of damages, as they are both supported by substantial credible evidence.

¶67.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR.**

---

[5] The trial court originally awarded $517,249 in economic damages and $250,000 in non-economic damages. UMMC filed a motion to alter or amend, arguing that the damages award exceeded the MTCA's statutory cap, and the trial court amended its award to $458,258 for economic damages and $41,742 for non-economic damages.